UTICA MUTUAL INSURANCE COMPANY *v.* ROBERT G. UEDING d/b/a UEDING FLYING SERVICE AND MIDWEST PAWNEE CENTER

[No. 1-1276A255. Filed December 6, 1977.]

*James L. Crawford, Scopulos and Crawford*, of Terre Haute, for appellant.

*Paul B. Ledford, Paul B. Ledford Professional Corporation*, of Vincennes, for appellees.

ROBERTSON, C.J.—Defendant-appellant, Utica Mutual Insurance Company (Utica) appeals from a judgment in the sum of $26,545.19 which was rendered in favor of plaintiff-appellee Robert Ueding (Ueding). Utica raises three issues on appeal:

I. Did the insurance policy issued by Utica cover the airplane in question?

II. Did Utica's insurance policy provide coverage for the occurrence in question?

III. Did the trial court improperly compute the award of damages?

Ueding was in the business of selling and servicing small aircraft, particularly crop-dusting airplanes, and was also involved in the business of crop-dusting. In September of 1973, Ueding purchased a new Piper Pawnee Brave (Piper) crop-dusting plane from a dealer in Florida. Michael Burgett, who was a pilot employed by Ueding, was sent to Florida to pick up the Piper. While en route home, Burgett made an emergency landing in a farm field near Russellville, Kentucky. Although the landing was completed without incident, the subsequent take-off was not. For unknown reasons, Burgett hit a fence and barn on take-off, which substantially damaged the Piper. The airplane was transported to Ueding's place of business in Vincennes where it was eventually repaired and sold.

Utica denied all liability for damages which were caused by the crash of the Piper. Ueding then instituted this action, which resulted in judgment against Utica.

Utica first argues that it is not liable to Ueding because the airplane that crashed was not one which was insured under its policy. Utica contends that this conclusion is inescapable because the plane was not listed on the schedule of covered aircraft and because the provisions of the Automatic Insurance for Newly Acquired Aircraft [Commercial] Endorsement do not apply in this case.

It is undisputed that the Piper was not a scheduled aircraft under the policy. Only two airplanes were listed on the schedule, neither of which was the Piper. Under the automatic insurance endorsement all newly acquired additional aircraft were covered automatically, but only if Utica was the insurer for all of the insured's aircraft at the time of acquisition. Utica concludes that because Ueding conceded at trial that not all of his aircraft were insured through Utica, the automatic insurance endorsement is inapplicable and the Piper was therefore not a covered airplane. It further contends that the trial court erroneously ruled in favor of Ueding because Ueding testified that all of his insurance was procured through the same agency and underwriter.

The judgment of the trial court must be affirmed on appeal if it can be sustained on any legal theory which the evidence supports. *Brockman v. Detroit Diesel Allison Division* (1977), 174 Ind. App. 240, 366 N.E.2d 1201. Therefore, we need not consider whether the basis of the trial court's judgment is erroneous, for we feel its judgment can be sustained on other grounds.

Ueding concedes that the Piper was not a scheduled airacraft and that the automatic insurance endorsement is not applicable. However, he argues that the Piper was insured under the provisions of the Reporting Form Policy Endorsement. Paragraph one of the latter endorsement reads as follows:

1. AIRCRAFT COVERED—The insurance afforded under this Policy shall apply to all standard licensed Fixed Wing

Land aircraft owned by the Insured at the inception date of this Policy and shall automatically apply to any additional standard licensed aircraft (excluding any military surplus craft unless specifically endorsed hereon) acquired by the Insured as owner during the Policy period, effective as of the time and date the Insured acquires possession of such additional aircraft.

Ueding testified that as a dealer in agricultural airplanes, it was his practice to insure those airplanes under this endorsement. There were other provisions in this endorsement which described the manner in which the premiums were to be computed and that those premiums should be sent to Utica along with the monthly reports required under paragraph four, which reads in pertinent part as follows:

4. REPORTS—The Insured agrees to keep accurate records pertaining to all aircraft insured under this Policy and to report monthly the following information with respect to each aircraft insured under the Policy during the preceding month: Make and type of aircraft license number, insured value as defined in paragraph 2 of this Endorsement, and *the number of days the Company has been at risk with respect to each such aircraft.* The company *shall not be liable* for any claims with respect to any aircraft *which has not been reported* from the date the Insured acquired such aircraft as owner *as provided above* .... (emphasis added).

In summary, Ueding argues that because he sent the proper information as to the Piper in his monthly report following his acquisition of the aircraft, along with the proper premium, the plane was covered under the Reporting Form Policy Endorsement. Utica, on the other hand, argues that additional planes can be insured only under the automatic endorsement and not under the reporting endorsement.

When interpreting the provisions of an insurance policy, this Court cannot extend the coverage delineated by clear and unambiguous language in the insurance contract. *Ely v. State Farm Mutual Automobile Insurance Company* (1971), 148 Ind. App. 586, 268 N.E.2d 316. However, it is well settled that where the language of an insurance policy is so

ambiguous as to be susceptible of more than one interpretation, the court will adopt the construction most favorable to the insured. *State Farm Fire and Casualty Co. v. Ackerman* (1972), 151 Ind. App. 464, 280 N.E.2d 332. Furthermore, it was stated in *O'Meara v. American States Insurance Co.* (1971), 148 Ind. App. 563, 268 N.E.2d 109, that:

> In order to constitute ambiguity so as to be susceptible to more than one interpretation, it must be shown that reasonably intelligent men on reading the insurance contract would honestly differ as to its meaning. 268 N.E.2d at 111.

It seems to us that the provision of the two endorsements are indeed conflicting. Both endorsements explicitly supersede Agreement IV of the printed policy, which was the original provision concerning coverage of additional airplanes. Both endorsements provide a procedure by which newly acquired planes will be insured, but the two list different requirements. We certainly feel that reasonably intelligent men would differ as to whether these provisions were complimentary or mutually exclusive. We hold, therefore, that Ueding properly brought the Piper within the coverage of the policy by using the procedure outlined in the reporting endorsement.

Utica next argues that the policy did not cover this particular occurrence due to the following special provision:

> This Policy does not apply to any occurrence or to any loss or damage involving the intentional use, except emergency, of any location other than an airport, regularly used for a normal landing and taking off of the type aircraft insured udner this Policy.

Specifically, Utica contends that the trial court's finding that Burgett's use of the field for a landing and take-off was an emergency is not supported by sufficient evidence and is contrary to law.

In determining whether a judgment is supported by sufficient evidence, this Court neither weighs the evidence nor resolves questions of credibility of witnesses. Rather, this Court views only the evidence most favorable to the appellee, together with all logical inferences flowing therefrom.

*Rieth-Riley Construction Co., Inc. v. McCarrell* (1975), 163 Ind. App. 613, 325 N.E.2d 844. In addition, it is only where the evidence leads to but one conclusion and the trial court has reached an opposite conclusion, that its decision will be disturbed as being contrary to law. *Chaney v. Tingley* (1977), 174 Ind. App. 191, 366 N.E.2d 707.

Burgett, the pilot, testified that while flying over Kentucky, he noticed a sharp vibration in the left front cowling, which is a large aluminum plate covering the engine. (An inspection of the cowling after the accident showed that a latch on the cowling was defective and had come loose during the flight.) Burgett stated that he began looking for a place to land in order to fix the cowling. Although he found a highway large enough for a landing, he decided there was too much traffic to afford a safe landing, and instead chose the field. After landing in the field, he taxied to the south end, fastened the cowling latch, and attempted his ill-fated take-off. He testified that the whole procedure took about two minutes.

Burgett and Ueding, both experienced pilots, gave undisputed testimony that a loose cowling would justify an emergency landing. This was also the opinion of Kermit Patchett, an experienced pilot and flight instructor. Furthermore, these pilots testified that it was possible under such circumstances for a piece of cowling to tear loose and fly back through the windshield and into the pilot's face.

The above testimony is sufficient to sustain the trial court's finding that Burgett's landing was an emergency.

Utica would have us draw a distinction between an emergency landing and an emergency take-off, theorizing that while landing in this case may have been an emergency, the subsequent take-off was not. This argument is then supported by testimony that the plane was in no danger while parked in the field.

Such a myopic interpretation of the restriction in this policy is wholly unnecessary. The landing and take-off were both caused by the same emergency event, and were integral parts of a single

transaction. Utica's suggestion that Burgett should have left the plane in the field and later had it dismantled and removed by truck, borders on the absurd when considered in light of testimony that the plane would probably have been damaged during such an operation, and further, that the type of take-off made in this situation is considered to be a routine take-off for a crop dusting plane.

Utica lastly argues that the damages awarded were excessive, not supported by sufficient evidence, and contrary to law.

The trial court awarded damages as follows:

A. Cost of Aircraft Repair — $23,637.19.

B. Damage to Barn —            1,800.00.

C. Damage to Fence —             150.00.

D. Attorney Fees and Court
   Costs —                       450.00.

E. Transporting Aircraft from scene
   of wreck to Vincennes —    1,008.00.

Utica first argues that there was insufficient evidence as to the amount of damage to the barn and fence. It further argues that Ueding failed to prove that he was legally liable for those damages.

Ueding's undisputed testimony showed that the owner of the barn and fence filed suit against Ueding to recover for the damages to his property and that Ueding settled the suit by paying the above-listed figures. He further testified that he incurred court costs and attorney's fees in the sum of $450.00 when Utica refused to defend him in that action.

Under coverage in part I of the policy, Utica is liable for all sums that Ueding becomes "legally obligated to pay" due to the operation of an insured aircraft. Under part II of the policy, Utica clearly is bound to defend Ueding in any action brought against him for personal injury or property damage caused by the operation of covered aircraft. Ueding's undisputed testimony is sufficient to support the amount of

damages awarded for the damages to the barn and fence. Because Utica refused to defend, it is also liable for the legal expenses incurred by Ueding in defending that suit. *All-Star Insurance Corp. v. Steel Bar, Inc.* (N.D. Ind. 1971), 324 F. Supp. 160. Furthermore, because Utica wrongfully failed to defend or represent Ueding, it cannot now contest his legal liability in that suit.

Utica next attacks the damages awarded for the cost of repairing the Piper. First, it is argued that no evidence was introduced as to the cost of the materials used in repairing the plane. Second, it is argued that the trial court failed to calculate the charges for labor in the manner required under the policy.

Ueding testified under direct examination that the cost of repairing the Piper was $23,637.19. (All repairs were performed in Ueding's own shop.) He also introduced into evidence a work order which listed the parts and material used in repairing the Piper, plus the costs of those parts and materials. This work order showed a cost breakdown of $16,698.94 for parts and materials and $6,938.25 for labor. No objection was made to this evidence, Ueding was not cross-examined as to this evidence, and no other evidence was introduced to dispute Ueding's figures. This is sufficient to sustain the trial court's judgment as to the costs of the materials needed to repair the Piper.

As to the award of $6,938.25 for labor, Utica cites the following limitation contained in the insurance policy.

In the event of partial loss, the Company's liability shall not exceed the actual cost to repair the damaged property with parts and material of a like kind and quality, less discounts, if any . . . *When repairs are effected by that Named Insured, an amount equal to 50% of actual wages paid, excluding charges for overtime, shall be added for overhead.* (Emphasis added).

We must agree with Utica that the evidence in this case does not indicate whether or not the labor charge listed on the worksheet represented the actual wages paid to the mechanics. Although there is a worksheet showing the number of hours worked by each mechanic, there is nothing to indicate the hourly

rate or salary paid to those mechanics. Therefore, the trial court erred by merely awarding judgment for the labor charges shown on the work order and this case must be remanded for a hearing to determine the actual amount of wages paid by Ueding for the repair of the Piper. When the amount of actual wages is determined, those wages, plus 50% of that figure for overhead, must be substituted for the $6,938.25 previously awarded.

Utica lastly argues that the trial court erred by awarding damages in excess of those contained in Ueding's complaint and other pleadings. However, the recovery of a plaintiff in a civil action is governed by the evidence adduced at trial, even where this varies from the relief requested in that party's pleadings. *Ayr-Way Stores v. Chitwood* (1973), 261 Ind. 86, 300 N.E.2d 335. Under Indiana Rules of Procedure, Trial Rule 15, the pleadings of the case can be amended to conform to the evidence at any time:

> The Indiana Rules of Civil Procedure do not hold a plaintiff to the strict letter of his complaint, but provide that the pleadings may be amended at any time, even after judgment, to conform to the evidence actually produced at trial. *Physician's Emergency Service, Inc. v. McCarthy* (1975), 165 Ind. App. 21, 330 N.E.2d 380, 383.

With the exception of the wages paid in repairing the Piper, the award of damages by the trial court is well supported by the evidence. Therefore, there was no error in granting an award of damages greater than that prayed for in the complaint.

The judgment is affirmed in part and reversed in part, and remanded for further proceedings in accordance with this opinion.

Lowdermilk and Lybrook, JJ., concur.

NOTE—Reported at 370 N.E.2d 373.