681 F.2d 490
 Matthew SUR, by his next friends, Robert Sur and Carol Sur,
Plaintiffs-Appellants,
v.
GLIDDEN-DURKEE, A DIVISION OF S. C. M. CORPORATION, and the
Prudential Insurance Company of America,
Defendants-Appellees.
 No. 81-2029.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 2, 1982.
Decided June 21, 1982.
 
 Stephan Lustina, Merrillville, Ind., for plaintiffs-appellants.
 Leonard M. Holajter, Friedrich, Bomberger, Tweedle & Blackmun, Highland, Ind., Alan H. Goldstein, Dutton, Kappes & Overman, Indianapolis, Ind., for defendants-appellees.
 Before BAUER, CUDAHY and POSNER, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 Plaintiff Robert Sur appeals from the district court's orders granting summary judgment to defendants, Glidden-Durkee, a division of S.C.M. Corporation ("Glidden-Durkee")[1] and the Prudential Insurance Company of America ("Prudential"). We reverse and remand.
 
 
 2
 * From October 1, 1975 to March 31, 1978, Robert Sur was an employee of defendant Glidden-Durkee and, as such, was insured under the company's group health insurance policy issued by defendant Prudential. The terms of the policy were set forth in a booklet issued to employees, a copy of which is attached to the Amendment to the Complaint.[2] The policy's coverage extended to Sur and to his "eligible dependents." According to the booklet, "Eligible dependents are your lawful wife or husband and your unmarried children at least 14 days old but less than 19 years old. Children are eligible from birth for Major Medical Expense Insurance." The policy's Basic Plan provided coverage, up to specified maximum amounts, for hospital, surgical, and other medical expenses. The Major Medical Plan provided coverage, subject to a deductible and to payments made under the Basic Plan, for 80% of hospital, surgical and other expenses, to an overall maximum of $100,000.00.
 
 
 3
 With respect to termination of the insurance policy, the booklet stated that insurance coverage would terminate when the employee "ceased active work," and that should the employee cease active work for any reason, he should find out from his employer what coverage if any could be continued in force. The booklet stated, further, that an employee could change to an individual policy if his group coverage terminated through termination of his employment.
 
 
 4
 Sur's wife became pregnant in August 1977. Several months previously, in anticipation of the pregnancy, Sur had consulted with Josie Sbarra, a Glidden-Durkee employee, regarding his health insurance, requesting and receiving "the necessary paperwork for the doctors and the hospital."[3]
 
 
 5
 On March 31, 1978, when Sur's wife was eight and one-half months pregnant, Sur voluntarily terminated his employment at Glidden-Durkee. Two weeks before he left the company, he asked a Glidden-Durkee representative, Walter Wolfe, what his insurance coverage would be if he quit. Wolfe told him he "would have coverage by converting after (he) quit."[4] Wolfe did not say, and Sur did not ask, whether his coverage upon conversion would be the same as his coverage under the group policy. Sur believed that the coverage would be the same. Before he left Glidden-Durkee, Sur spoke to Josie Sbarra about converting his insurance policy. Sbarra provided him with the conversion application, which Sur completed and mailed to Prudential. In due course Prudential sent Sur a conversion policy.
 
 
 6
 Before Sur received the conversion policy from Prudential, his son Matthew was born. At birth, Matthew suffered from gastroschisis-in lay terms, "he was born with everything on the outside."[5] He has undergone several major operations, and it is expected that he will require continuous medical treatment and periodic hospitalization for the rest of his life.
 
 
 7
 The conversion policy that Sur received from Prudential after Matthew's birth included several plans from which Sur could choose. None of the plans offered the same coverage as that provided in the group policy. Sur called an attorney. After consulting with his attorney, he selected the policy that offered the most coverage of the alternatives presented to him. Under the policy he chose, Matthew was a covered dependent as of the date of his birth, but only Basic benefits, and no Major Medical benefits, were provided. Matthew's medical expenses far exceeded the maximum benefits allowable under the conversion policy's coverage. As of September 20, 1979, Prudential has paid $8,590.25 toward Matthew's medical expenses, in accordance with the conversion policy. According to the complaint, by April 1979, Matthew's actual medical expenses exceeded $60,000.00.
 
 
 8
 Sur filed the present lawsuit on April 24, 1979, basing jurisdiction on diversity of citizenship.[6] Prudential moved for summary judgment on September 25, 1979. The district court granted the motion, in accordance with a federal magistrate's Report and Recommendation, on August 29, 1980. On December 2, 1980, Glidden-Durkee moved for summary judgment. The district court granted the motion, upon the Report and Recommendation of the magistrate, on June 4, 1981. This appeal followed.
 
 II
 
 9
 Sur contends that the summary judgments were improper because his claim raises a genuine issue of material fact that should be submitted to a jury. According to Sur, he failed to seek medical insurance elsewhere because he believed his coverage under the conversion policy would be the same as his coverage under the group policy. He admits he was mistaken in this belief, but he argues that his arrival at this mistaken conclusion was the result of his reasonable reliance on information contained in his group-policy booklet, and that because he reasonably relied on the booklet, the defendants should be estopped from denying group-policy coverage for Matthew's medical expenses.[7] He argues that whether he acted reasonably presents a genuine issue of material fact, precluding summary judgment.
 
 
 10
 Glidden-Durkee responds that the reasonableness of Sur's reliance is not material because Sur has not demonstrated that Glidden-Durkee committed any act or omission or made any misrepresentation that could form a basis for its liability to Sur. In a similar vein, Prudential argues that estoppel cannot apply here because no representations were made to Sur upon which he can claim that he relied and acted to his detriment.
 
 
 11
 We note at the outset that all three of the parties appear to assume that Glidden-Durkee and Prudential are interchangeable entities with coextensive obligations running to Sur. The assumption is incorrect. As an insurer, Prudential can be estopped from denying coverage to Sur if Sur reasonably relied to his detriment upon some act, omission or representation of Prudential or its agents. See, e.g., Wayne Chemical v. Columbus Agency Service Corp., 426 F.Supp. 316, 323 (N.D.Ind.1977); Continental Insurance Co. v. Thornburg, 141 Ind.App. 554, 219 N.E.2d 450, 454 (1966); see generally 16B J. Appleman, Insurance Law and Practice § 9088 at 556-61 (1981). Misrepresentations made by Glidden-Durkee are not imputable to Prudential because Glidden-Durkee is not Prudential's agent. Under Indiana law, when an employer negotiates a group insurance contract with an insurance company, the employer acts as the agent of its employees, not of the insurance company. Metropolitan Life Insurance Co. v. Henry, 217 Ind. 33, 36-38, 24 N.E.2d 918 (1940); Prudential Insurance Co. of America v. Lancaster, 139 Ind.App. 292, 297, 219 N.E.2d 607 (1966); Morales v. Equitable Life Assurance Society, 115 Ind.App. 565, 567, 60 N.E.2d 747 (1945); see 16 J. Appleman, Insurance Law and Practice § 8734 at 390-93 (1981). Thus, Prudential may be estopped from denying coverage only by reason of its own actions, not those of Glidden-Durkee. As for Glidden-Durkee's liability to Sur, if any, it would arise not by estoppel but because of the company's breach of a duty it owed Sur in its capacity as Sur's agent. Because each defendant is responsible only for its own acts, omissions or representations, we examine Sur's claim against each separately.
 
 A. Glidden-Durkee
 
 12
 As noted above, Glidden-Durkee is deemed to be Sur's agent and may be held liable to him for the breach of a duty owed by an agent to its principal. Under Indiana law, an agent of an insured owes the insured a duty of good faith and due diligence in obtaining adequate insurance for him, e.g. Bulla v. Donahue, 174 Ind.App. 123, 366 N.E.2d 233, 236 (1977). Employers are not exempted from this duty. For example, in Sims Motor Transport Lines, Inc. v. Davis, 126 Ind.App. 344, 130 N.E.2d 82 (1955), an employer deducted money from the paycheck of an "independent contractor" retained by him, ostensibly to provide life insurance for the independent contractor. The employer failed, however, to obtain such insurance, and the independent contractor died without life insurance coverage. The court held the employer liable for the face amount of a life insurance policy that could have been purchased with the amounts deducted from the deceased's paycheck.[8]
 
 
 13
 An employer also owes a duty to its employee to inform him of his conversion rights under the group policy. In Sheller-Globe Corp. v. Sheller, 413 N.E.2d 318 (Ind.App.1980), an employer obtained a group life insurance policy for its employees. When one of the covered employees decided to retire, the employer's representative told him, incorrectly, that he could not convert his group policy to an individual policy. He therefore made no effort to convert, and he was no longer covered when he died shortly after his retirement. His widow sued the employer and the insurance company, seeking to recover under the group policy. The Indiana appellate court affirmed the judgment against the employer. The court held that the evidence was sufficient to warrant the trial court's finding that the employer "was negligent in discharging its responsibility to inform (the employee) of his conversion right under the group policy." Id., 413 N.E.2d at 321. Because the deceased would have converted had he not been misinformed, the employer was held liable for the amount payable under the group policy.[9]
 
 
 14
 We can only conclude, in light of Sheller-Globe, that Glidden-Durkee owed a duty to Sur to inform him about his conversion rights under the group health insurance policy, and that this duty included, at the least, a duty not to mislead Sur with regard to the extent of his conversion rights.[10] The question, then, is whether Glidden-Durkee misrepresented Sur's conversion rights to him, thereby breaching the duty it owed him.
 
 
 15
 The magistrate addressed this question (albeit under the rubric of estoppel or "detrimental reliance" rather than breach of a duty to inform) and found that the record contained no evidence to support Sur's claim that he was misinformed. The magistrate concluded that Sur admitted in his deposition that "there was no instance of any representation being made by Glidden-Durkee or its agents which caused him to believe that he would continue to receive the identical kind of insurance coverage after his termination of employment as he had before termination." Magistrate's Report and Recommendation, February 26, 1981, at 2 (emphasis added). As we read the record, however, Sur made no such admission. Sur does admit that no Glidden-Durkee representative told him explicitly that his conversion policy would carry the same coverage as his group policy. But Sur also maintains, and testified at his deposition, that Glidden-Durkee made some representations to him. Whether these representations "caused him to believe" that his conversion policy would be substantially the same as his group policy is a crucial, and contested, issue of fact that should be submitted to a jury.
 
 
 16
 A fair reading of Sur's deposition testimony reveals that before Sur left Glidden-Durkee, he attempted to determine how his departure would affect his health insurance coverage. He read the booklet describing his policy. He read the passage instructing him to ask his Employee Benefits Administrator what coverage, if any, could be continued in force upon his ceasing active work with the company. He followed this instruction. He asked Walter Wolfe what his coverage would be, and Wolfe told him that he would have coverage if he converted.[11] Wolfe did not tell him his coverage would be different, when in fact his coverage under the conversion policy, which completely excluded Major Medical benefits, was substantially different.
 
 
 17
 On the basis of these facts, a rational trier of fact could conclude that when Wolfe assured Sur he would have coverage if he converted, but failed to qualify the assurance by warning him that his coverage would be reduced by $100,000.00 in Major Medical benefits, he so misled Sur about his conversion rights that his statement amounted to a material misrepresentation. That Wolfe did not affirmatively tell Sur his coverage would be the same may be relevant to the factfinder's inquiry, but is not dispositive, for a material omission can be as misleading as an affirmative statement. Should the jury find that Sur was thus misled, it would be justified in concluding that Glidden-Durkee was "negligent in discharging its responsibility to inform (Sur) of his conversion right under the group policy". Sheller-Globe, supra, 413 N.E.2d at 321. Accordingly, we conclude that the grant of summary judgment to Glidden-Durkee was error.
 
 B. Prudential
 
 18
 We also conclude that the grant of summary judgment to Prudential was error. As we noted above, Prudential may be held liable to Sur under a theory of estoppel if Sur reasonably relied to his detriment on the acts, omissions or representations of Prudential. Sur argues that a rational jury could find that the group-policy booklet distributed to Sur contains misleading representations about his conversion rights, and that in reasonable reliance on such misleading representations, he formed the belief that his conversion policy would be quite similar to, if not the same as, his group policy, and agreed to purchase the conversion policy, to his obvious detriment.[12] Should the jury so find, Prudential would be estopped from denying Sur coverage equivalent to his group-policy coverage.
 
 
 19
 Before we discuss the issue raised, we would emphasize the procedural posture of this case. In this appeal from the grant of summary judgment to Prudential, Sur asks us, not to determine Prudential's liability, but only to determine whether the question of Prudential's liability should have been submitted to a jury. Therefore, our holding here goes not to the merits of Sur's claim but to the existence of a genuine issue of material fact.
 
 
 20
 Furthermore, we emphasize that Sur does not ask us to construe the group-policy booklet to find that the group policy covers Matthew.[13] All sides agree that Matthew is covered under the conversion policy. Sur argues that Prudential should be estopped from refusing to include Major Medical coverage in the conversion policy because Prudential, through its booklet, induced Sur to believe that Major Medical coverage would be included in the conversion policy. Ordinarily, whether an insurer should be estopped is a question for the jury to decide, see, e.g., Huff v. Travelers Indemnity Co., 266 Ind. 414, 363 N.E.2d 985 (1977), unless the facts allegedly giving rise to the estoppel are undisputed and susceptible of only one interpretation, see, e.g., Continental Insurance Co. v. Thornburg, 141 Ind.App. 554, 219 N.E.2d 450 (1966).[14] Our task, therefore, is not to construe the booklet's provisions and declare whether they are misrepresentative. Rather, our task is to determine whether a rational jury could conclude that the booklet is misleading in that it could reasonably be read as contemplating a conversion policy with essentially the same coverage as the group policy.
 
 
 21
 We turn, then, to the inquiry at hand: what reasonable interpretation (or interpretations) may be placed upon the representations contained in the group-policy booklet? We have discovered no Indiana case addressing the question presented here, and we must resolve the issue as the Indiana courts would probably resolve it. See, e.g., Craft v. Economy Fire & Casualty Co., 572 F.2d 565 (7th Cir. 1978). Since the allegedly misleading representations in this case are contained in Prudential's group-policy booklet, we can best be guided, in examining the booklet's provisions, by the general principles of construction of insurance policies established under Indiana law.[15] These general rules are outlined in Huntington v. Mutual Insurance Co. v. Walker, 392 N.E.2d 1182 (Ind.App.1979):
 
 
 22
 It is an elementary rule of construction that one should give words their ordinary meaning. O'Meara v. American States Ins. Co., (1971) 148 Ind.App. 563, 268 N.E.2d 109, 112. When interpreting the provisions of an insurance policy, the court cannot extend the coverage delineated by clear and unambiguous language in the insurance contract. Utica Mutual Ins. Co. v. Ueding, (1977) Ind.App., 370 N.E.2d 373; Ely v. State Farm Mutual Automobile Ins. Co., (1971) 148 Ind.App. 586, 268 N.E.2d 316. However, it is well-settled that where the language of an insurance contract is so ambiguous as to be susceptible of more than one interpretation, the court will adopt the construction most favorable to the insured. Utica, supra; State Farm Fire and Casualty Co. v. Ackerman, (1972) 151 Ind.App. 464, 280 N.E.2d 332. This is all the more so where the particular provision in dispute purports to create an exclusion from coverage under the general terms of the policy. Gulf Ins. Co. v. Tilley, (N.D.Ind.1967) 280 F.Supp. 60, 64, aff'd, 393 F.2d 119. A condition or exclusion in an insurance contract, therefore, in order to be effective, must clearly and unmistakingly bring within its scope the particular act or omission that will bring the condition or exclusion into play. Gulf Ins., supra; Masonic Acc. Ins. Co. v. Jackson, (1929) 200 Ind. 472, 164 N.E. 628. Coverage will not be excluded or destroyed by an exclusion or condition unless such clarity exists. Gulf Ins., supra; German Fire Ins. Co. v. Stewart, (1895) 13 Ind.App. 627, 42 N.E. 286.
 
 
 23
 Id. at 1185. Further, an insurance policy will be found to be ambiguous if, reading the policy as a whole, reasonably intelligent people would differ as to its meaning, see, e.g., Stockberger v. Meridian Mutual Insurance Co., 395 N.E.2d 1272, 1277 (Ind.App.1979). Ambiguity may arise, for example, where a term is not defined in the policy, e.g., Farmers Mutual Aid Ass'n v. Williams, 386 N.E.2d 950 (Ind.App.1979) (homeowners' insurance policy, which covered damage resulting "directly" from tornado, did not define "directly"), or where one provision in the policy conflicts with another, e.g., Utica Mutual Insurance Co. v. Ueding, 370 N.E.2d 373 (Ind.App.1977) (aircraft insurance policy contained two provisions relating to addition of aircraft to insured's fleet). Of course, the insured's mere assertion of an interpretation different from the insurance company's interpretation does not give rise to an ambiguity; the insured's proffered interpretation must be acceptable by reasonably intelligent people. Stockberger, supra, 395 N.E.2d at 1277; Equitable Life Assurance Society v. Short, 165 Ind.App. 338, 344, 332 N.E.2d 273 (1975).
 
 
 24
 With the foregoing in mind, we turn to the provisions of the group-policy booklet. The booklet contains a detailed explanation of the coverage provided under the group insurance policy, and, in addition, contains information concerning termination of coverage, extension of benefits notwithstanding termination, and conversion to an individual policy after termination. For present purposes, the pertinent provisions of the booklet are as follows:
 
 EXTENSION OF BENEFITS
 
 25
 If the Hospital, Surgical and Diagnostic X-Ray and Laboratory Expense Insurance benefits terminate, benefits will nevertheless be paid for a hospital confinement commencing, or a surgical procedure or examination performed, within three months after termination, provided that the confinement, procedure or examination results from a total disability that began while the insurance was in force and that benefits would have been paid had the insurance continued. The Hospital and Surgical Expense Benefits will also be paid in connection with a pregnancy which commenced before insurance terminated and which would have been covered had the insurance continued.
 
 
 26
 Major Medical Expense Benefits will be available after termination of insurance if you or a covered dependent is totally disabled when the insurance terminates, but not beyond the end of the one year period following such termination. This extension will apply while totally disabled and only to expenses due to the sickness or injury causing the total disability. Benefits for pregnancy complications are also available after termination of insurance if the pregnancy commenced before such termination. These benefits are payable to the end of the pregnancy and, if the person is confined in a hospital at the end of the pregnancy, for the duration of the confinement.
 
 
 27
 (Employees' Booklet at 40.)
 
 TERMINATION OF INSURANCE
 
 28
 The insurance for yourself and your dependents will terminate if your employment terminates ....
 
 
 29
 Ceasing active work will be considered to be immediate termination of employment, except that, under certain conditions, employment may be deemed to continue for the purposes of some of the insurance, subject to certain time limits. If you cease active work for any reason find out immediately from your Employee Benefits Administrator what coverage, if any, can be continued in force.
 
 
 30
 (Employees' Booklet at 44.)
 
 
 31
 CHANGE TO AN INDIVIDUAL HOSPITAL AND SURGICAL EXPENSE INSURANCE POLICY
 
 
 32
 The Insurance Company makes available an individual Hospital and Surgical policy, subject to established rules, to an employee whose Hospital Expense Insurance is terminated through termination of employment.
 
 
 33
 The privilege also is available for certain covered dependents of an employee who dies-also for a covered child whose insurance is terminated due to attainment of the age limit or marriage, or due to termination of the employee's insurance on account of his eligibility for Part A of Medicare.
 
 
 34
 Application for the individual policy must be made within 31 days from the termination of the Group Coverage and is subject to the employee having been insured under the Group Insurance Plan for at least three months.
 
 
 35
 Additional information may be obtained from your Personnel/Administrative Manager by anyone who is eligible for an individual policy. Information is also available from a home office of the Insurance Company.
 
 
 36
 (Employees' Booklet at 45.)
 
 
 37
 Because Sur's argument is that the booklet misled him as to his conversion rights, our focus is upon the last provision reproduced above, entitled "Change to an Individual Hospital and Surgical Expense Insurance Policy." This provision does not affirmatively state that the conversion policy will carry the same coverage as the group policy; but that fact alone does not make the provision not misleading. We must examine the provision in its entirety, and in the context in which it appears, to determine whether a rational trier of fact could find it misleading.
 
 
 38
 Examining the conversion provision, we note first that it states that an individual policy is available "subject to established rules," but gives no clear indication what the "established rules" might be, or even what they might pertain to. It is not stated, for example, whether the rules pertain to eligibility for conversion, or to the extent of coverage upon conversion, or to some other aspect of the conversion privilege. Certainly there is no indication that one of the "established rules" is that Major Medical insurance cannot be converted. We also note that the third paragraph of the conversion provision requires the converting employee to have been insured under the group policy for at least three months. It seems to us that by this requirement Prudential indicates its intent only to accept the health risks of bona fide group-policy participants. This in turn might reasonably be read to suggest that Prudential intends to assume the same risks under the conversion policy as it accepts under the group policy.
 
 
 39
 In addition, although the conversion provision states that "additional information may be obtained" from the employer or from Prudential's home office, there is no clear warning that the employee should not rely solely on the provision to ascertain his conversion rights. To be sure, the provision entitled "Termination of Insurance" does affirmatively warn the employee to ask his employer "what coverage, if any, can be continued in force" when he ceases active work for any reason. But this warning is not addressed to the conversion privilege. We cannot say that it would be unreasonable for an employee, following the Termination provision's advice, to ask his employer what coverage could be continued, and, on being told he would be covered upon converting, to look to the conversion provision for information about his conversion rights. Such an employee would find no caveat that the conversion policy offers drastically reduced coverage.
 
 
 40
 Further, viewing the conversion provision in its context, we note that it does not appear in the booklet until after the detailed explanations of coverage and extension of benefits under the group policy, and is not set off from the group policy descriptions in any way. Thus, viewed as a whole, the booklet informs employees that Prudential will pay the listed benefits while they are members of the group, that after group coverage terminates Prudential will continue to pay benefits for illnesses incurred before termination, and that Prudential makes an individual policy available to employees whose group coverage terminates through termination of employment. With the conversion provision so couched, we cannot say that it would be unreasonable to infer that the coverage under the individual policy is to be the same as, or at least substantially similar to, the coverage under the group policy. It is for the jury to determine the reasonableness of such an inference.[16]
 
 
 41
 The most significant feature of the conversion provision, however, is that nowhere does it state that Major Medical coverage is not available upon conversion. The Major Medical insurance accounted for more than 90% of the delimited dollar coverage provided under the group policy. Given that fact, we think a rational jury could readily conclude that, in informing employees that a conversion policy is "available," while neglecting to inform them that the conversion policy covers only a small percentage of the group policy's maximum coverage, the booklet is materially misleading. This is particularly true in light of the Indiana courts' insistence that an insurance company articulate with utmost clarity those risks that it does not intend to insure against in the policies it holds out for sale. See Huntington Mutual Insurance Co. v. Walker, supra, 392 N.E.2d at 1185; Allied Fidelity Ins. Co. v. Lamb, supra, 361 N.E.2d at 179; Casey v. Transamerica Life Insurance & Annuity Co., 511 F.2d 577, 579 (7th Cir. 1975).
 
 Conclusion
 
 42
 We hold, viewing the facts presented here in the light most favorable to Sur, that a rational jury could conclude that Glidden-Durkee breached its duty properly to inform Sur of his conversion rights, and that Prudential misled Sur as to his conversion rights through its representations in the group-policy booklet. The summary judgments are therefore reversed, and the case is remanded for further proceedings.
 
 
 43
 POSNER, Circuit Judge, dissenting.
 
 
 44
 This case was fought out below on the understanding that the issue was whether Matthew Sur was (or by principles of estoppel should be held to be) entitled to major medical benefits under the provisions of the group policy relating to extended coverage, that is, coverage that continues after the employee (who in this case was Matthew's father) ceases to be employed. The case is decided today on a different theory: that Mr. Sur was misled, by his employer (SCM) and the insurer (Prudential), concerning his right to convert to an individual policy. The employer's liability is based on the failure of its benefits officer, Wolfe, to explain to Sur the details of coverage of the individual policy. This is, I shall argue, a threadbare theory, but at least it was presented to the trial court, if halfheartedly.
 
 
 45
 The insurer's liability, however, is based on a theory of this court's invention: that Sur was misled by the conversion clause in the booklet explaining the group policy. Sur was asked at his deposition, "With respect to whatever portion of the booklet you indicated caused you to determine that coverage would be the same, could you examine the booklet and identify whatever section of the book you relied upon." Sur dep. 14-15. In response, Sur read several paragraphs, all related to extension of benefits, but did not mention the conversion clause. See id. at 15-17. Nowhere in the appellate record is there a reference by any of the parties to that clause. The plaintiffs have repeatedly cited the provisions of the pamphlet that they allege to be misleading, but have never suggested that the conversion clause is one of them. It is an abuse of our power of appellate review to reverse a trial court on the basis of a claim that was not presented to that court. It only magnifies the abuse that the claim was not argued to us either.
 
 
 46
 On the merits, I can find no basis either in the pamphlet or in any of the alleged oral representations and omissions for giving the plaintiffs a shot at the jury against either defendant. Wolfe told Sur that he "would have coverage by converting after (he) quit" (Sur dep. 10), but the scope of coverage on conversion was not discussed. In Sur's words, "nothing was discussed as that I thought it would be the same. That is what I thought all the way through." Id. He expressly acknowledged that no one had ever told him "that the policy on conversion provided exactly the same benefits as the group policy which covered (him) during the term of (his) employment." Id. at 13. Upon then being asked on what he had based his assumption of identical coverage, Sur answered, "By reading the policy thoroughly. It stated in one part of there where the coverage would be extended to me." Id. This answer confuses conversion to an individual policy with extension of benefits under the group policy, but in any event makes clear that if there is any basis for misrepresentation or estoppel in this case it must be somewhere in the pamphlet rather than in what Wolfe said or failed to say. All he said was, yes, Sur could convert.
 
 
 47
 Nor did Sur say or fail to say anything to Wolfe that might have implied that Sur thought the coverage of the individual policy would be identical to that of the group policy. As Wolfe therefore had no reason to think Sur was under any misapprehension concerning the coverage of the individual policy, he had no duty to volunteer an explanation of what that coverage was and specifically whether it included major medical benefits. Sheller-Globe Corp. v. Sheller, 413 N.E.2d 318 (Ind.App.1980), is not in point. That was a case of misrepresentation-of the employer telling the employee that he had no conversion right, when he did. See id. at 320 n.3. There was nothing like that in this case.
 
 
 48
 Nevertheless, Sur's simple question about conversion might have required a fuller answer than Wolfe gave if the conversion clause in the pamphlet was misleading; for then Wolfe may have had a duty to anticipate and correct Sur's misapprehension. This means that Sur's case both against SCM and against Prudential depends on our concluding that a reasonable trier of fact could have found that the pamphlet promised identical coverage if the employee converted to an individual policy.
 
 
 49
 The pamphlet is entitled "Group Insurance Plan." The Foreword states that the plan has two parts. Part I is entitled "Death Termination and Maternity Expense benefits provided by SCM Corporation." There is no suggestion that Sur thought he would be getting any of this coverage when he converted. Part II is entitled "Life, Hospital Expense, Surgical Expense, Diagnostic X-Ray and Laboratory Expense and Major Medical Expense Insurance." This listing is significant because it includes at least one item-life insurance-that Sur could not possibly have thought embraced by the conversion clause applicable to health insurance. For that clause is entitled "Change to an Individual Hospital and Surgical Expense Insurance Policy," and reads, so far as is pertinent to this case: "The Insurance Company makes available an Individual Hospital and Surgical Policy, subject to established rules, to an employee whose Hospital Expense Insurance is terminated through termination of employment." Both title and text indicate that the coverage of the individual policy is narrower than that of the group policy-narrower even than the coverage of Part II. It is limited on its face to hospital and surgical expense, thereby excluding several other components of the group plan-including major medical benefits, as in MacDonald v. Penn Mut. Life Ins. Co., 276 So.2d 232 (Fla.App.1973), where the court found for the insurer on facts similar to those here.
 
 
 50
 In addition, all that the pamphlet here offered was "an" individual policy-not the same policy as the group policy. There is no suggestion that the individual policy is as comprehensive as the group policy and as I have suggested the opposite inference is the more natural one to draw from the title and description of the individual policy. Finally, the offer is "subject to established rules," which are not specified but which could hardly be assumed to be unrelated to coverage.
 
 
 51
 Only a careless reader-and Sur claims to have read the pamphlet "thoroughly," with specific reference to his rights after he left SCM-would think he was being given the right to buy the identical coverage that he had under the group policy. No precedent from Indiana or any other state supports reading such a right into the pamphlet; and no recitation of the clichEes of insurance-contract construction can fill the void. One is not surprised that Sur has never claimed to have been misled by the conversion clause. That claim is the invention of this court.
 
 
 52
 Now there is of course a tendency to cry wolf in judicial dissents and to utter prophecies of doom that become self-fulfilling by drawing attention to and then exaggerating the scope of the majority opinion. But I cannot subdue my concern that the majority opinion opens up breathtaking vistas of liability. Ordinarily this would be of little significance in a diversity case, where the last word on liability is the state courts' rather than ours. But since most insurance companies in Indiana are (I assume) nonresident corporations, and since most claims against them based on allegedly misleading coverage probably will exceed $10,000, it may be many years before the Indiana appellate courts have a chance to set us straight, though the Indiana legislature could do so at any time. Meanwhile I can see no limits under today's decision to the power of juries to read into group insurance policies and booklets promises that although not made or implied are not expressly negated either. As insurance companies are not popular defendants in jury trials, today's decision may impel them to rewrite their literature rather than take their chances with jury interpretation of the present language. The insurance-buying public will not be better off if efforts to explain group insurance policies become encumbered with the kind of hedges and caveats that are found in prospectuses for new issues of securities.
 
 
 53
 I do not want to sound the alarm too shrilly, however, so I shall end by noting a significant hurdle that the plaintiffs will have to leap when this case is tried: they will have to prove causation. The plaintiffs have been harmed by the defendants' failure to specify the coverage on conversion only if, but for this failure, Matthew would have been entitled to major medical benefits. There are two ways in which this might have come about. The first, which is very unlikely, is that Sur would have changed his mind about quitting SCM if he had known that his conversion privilege did not include major medical benefits. The second possibility is that he would have bought a broader policy than Prudential offered. But that would depend on availability, price, and the importance of major medical benefits in Sur's thinking before Matthew was born with terrible defects. The plaintiffs will have the burden of proving that Sur would have bought a policy with major medical benefits for dependents and they may find it a difficult burden to carry.
 
 
 54
 Despite this qualification, the majority's decision is potentially as far-reaching as it is an unjustified expansion of the liability of insurance companies. But above all, I deprecate our blindsiding the trial court.
 
 
 
 [1]
 Apparently the proper name of Glidden-Durkee is "Durkee Foods Division of SCM Corporation." See "Answer of Defendant Glidden-Durkee," Record, Doc. 14, at 1. The company has been referred to as Glidden-Durkee throughout the litigation, however, and that is the name we use here
 
 
 [2]
 As there has been no suggestion to the contrary, we assume, for purposes of this appeal, that the booklet accurately reflects the provisions of the master policy. We also assume that the booklet was written by Prudential. The record is not clear on this point. However, Prudential has never denied its responsibility for the booklet's contents. Because this is an appeal from a grant of summary judgment, we view the record in the light most favorable to the plaintiff
 
 
 [3]
 Deposition of Robert Sur, at 4-5
 
 
 [4]
 Id. at 10
 
 
 [5]
 Id. at 19
 
 
 [6]
 28 U.S.C. § 1332(a). The parties agree that this case is governed by Indiana law. See Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)
 
 
 [7]
 The dissent correctly notes that Robert Sur believed his son Matthew Sur was covered under the group policy. But the dissent incorrectly fails to acknowledge that Sur also thought his conversion coverage would be essentially co-extensive with his group coverage
 Apparently, the dissent, with respect to Prudential's liability, would have us ignore policy provisions which Sur did not specifically point to in his deposition or in his brief. But our duty in reviewing the district court's grant of summary judgment in this case is to examine the record to determine whether a jury could rationally agree with Sur that Prudential did indeed misrepresent his conversion coverage. This theory of liability is anything but "new," and Sur certainly urged it.
 
 
 [8]
 Apparently the employer did have a workers' compensation insurance policy, and there is some suggestion that the amounts deducted from the deceased's paycheck were applied to this policy. The deceased was not covered under the policy, however, because he was considered an "independent contractor" and not an "employee." The court evidently found this fact immaterial to the question whether, having made deductions from the deceased's paycheck, the employer met its obligation to obtain adequate life insurance for him
 
 
 [9]
 The court, however, reversed the judgment against the insurance company. The trial court had construed the group policy to extend coverage to the employee, notwithstanding his retirement, because of vacation time he had accrued and for which he was paid after he stopped working. The appellate court held that the group policy could not reasonably be so construed. No claim was made in Sheller-Globe that the insurance company had misled the deceased regarding his conversion rights
 
 
 [10]
 The dissent cites no other Indiana case suggesting that Sheller-Globe's flat statement that an employer has a "responsibility to inform (its employee) of his conversion right" should be limited to the specific facts before the Sheller-Globe court
 
 
 [11]
 Thus, it is not an undisputed fact, as Glidden-Durkee asserts, that "Sur made no effort to inquire of Glidden-Durkee regarding his conversion rights ...." Sur did inquire about his conversion rights; having been told he would be covered if he converted, he did not further ask whether his conversion-policy coverage would be the same as his group-policy coverage
 
 
 [12]
 Prudential does not deny that Sur suffered a detriment. We note parenthetically that the detriment lies in Sur's failure to seek health insurance elsewhere. As Sur argues, had he realized his insurance coverage was to be substantially reduced upon conversion, he might have sought individual coverage from another insurance company
 
 
 [13]
 It appears from Sur's deposition testimony that he may have believed the group policy's "Extension of Benefits" provision (which we reproduce below, at page 14) covered Matthew's medical expenses because it states that benefits for "pregnancy complications" are payable "to the end of the pregnancy, and if the person is confined in a hospital at the end of the pregnancy, for the duration of the confinement." (Emphasis added.) According to Prudential, "the person" means only "the mother." We observe that in describing the benefits paid for normal pregnancy (see Employees' Booklet at 10), the booklet specifically refers to "the mother"-not "the person." There may be an argument that if Prudential wished to restrict extended benefits for pregnancy complications to the mother, it could have used the more precise word, particularly since it did so in describing ordinary pregnancy benefits. Cf. Allied Fidelity Ins. Co. v. Lamb, 361 N.E.2d 174 (Ind.App.1977), in which an automobile insurance policy providing benefits for injury sustained by the insured through "physical contact" with a hit-and-run automobile was held not limited to "direct physical contact" (emphasis added); the court observed that if the insurance company wished to require "direct" contact, it could have said so. But we do not address such an argument here because Sur's claim, as we understand it, is that the conversion policy should include Major Medical coverage, not that Matthew is covered under the Extension of Benefits provision of the group policy
 
 
 [14]
 In Thornburg, the court held, as a matter of law, that the insurance company should be estopped by reason of its representation, upon which the insured had relied to his detriment. In that case the representation was contained in a letter from the insurance company to the insured, and the court held that only one "reasonable interpretation" could be placed upon the letter. Id., 219 N.E.2d at 454. In the present case, as is discussed below, we do not think it is absolutely clear that the insurance company's representations are susceptible of only one "reasonable interpretation."
 
 
 [15]
 As these principles have long been applied to insurance policies, Prudential cannot be said to be unduly burdened or surprised by our reference to them as guidelines in this context
 
 
 [16]
 In large part, the dissent simply disagrees with our view of the evidence. This disagreement bespeaks the need for a jury