Eleanor L. BURNS, Plaintiff-Appellee,

v.

**ROCKFORD LIFE INSURANCE COM-PANY, Defendant-Appellant.**

No. 83–2772.

United States Court of Appeals,
Seventh Circuit.

Argued May 1, 1984.

Decided July 25, 1984.

Rehearing and Rehearing En Banc
Denied Aug. 21, 1984.

John R. Pera, Greco, Gouveia, Miller, Pera & Bishop, Merrillville, Ind., for plaintiff-appellee.

Paul A. Rake, Eichhorn, Eichhorn & Link, Hammond, Ind., for defendant-appellant.

Before ESCHBACH and POSNER, Circuit Judges, and GRANT, Senior District Judge.*

POSNER, Circuit Judge.

This is a diversity suit to recover the proceeds of a life insurance policy on the basis of actions of an insurance agent employed by the insurance company. The company appeals from a judgment (entered on a motion for summary judgment) for $25,000 in favor of the policyowner. The parties agree that Indiana law governs the substantive issues.

In June 1978, Stephen Burns, age 22, purchased a life insurance policy from the defendant, naming his mother as beneficiary. For an extra $2.75 a month he also purchased a "Guaranteed Insurability" rider, which allowed him to buy up to $25,000 more life insurance, without supplying proof of insurability, at certain "Optional Purchase Dates," among them the sixtieth day after he married. The rider begins on page 12 of the policy and consists of a page and a half of normal-sized print, explaining the conditions clearly. The purpose of the 60-day waiting period is to discourage deathbed marriages, and is not unreasonable. When Stephen bought the policy, Rockford's agent, Robert Westgate, explained to Stephen that the "Guaranteed Insurability" rider would allow him to purchase insurance, without proof of insurability, on various occasions including marriage; but according to Mrs. Burns' affidavit in the district court, which is not contradicted, Westgate did not mention the 60-day waiting period. Mrs. Burns was present when Westgate sold her son the policy.

In October 1978, five months after buying the policy, Stephen became ill, and shortly afterward was diagnosed as having acute leukemia. On June 30, 1979, he married. On August 3, while a patient at Billings Hospital in Chicago, Stephen, in the presence of his mother and of agent Westgate, transferred ownership of the policy to her and signed a standard life insurance application form (filled out by Westgate) for an additional $25,000 of life insurance. Either Stephen or Mrs. Burns gave Stephen's marriage certificate to Westgate as proof of marriage; Mrs. Burns gave Westgate a check for $27.95 as payment of the first premium on the additional insurance; and Westgate gave her in exchange a copy of the application form that Stephen had just signed. Neither in the printed parts of the form nor in the parts written in by Westgate is there any reference to its being an application under the "Guaranteed Insurability" rider. Reading it without knowledge of the circumstances, one would think it an application for a new policy; for, rather than waiving proof of insurability, it conditions insurability on the applicant's being "in good health." Stephen died on August 24, 1979, five days before the sixtieth day after his marriage. The company refused to pay Mrs. Burns' claim for the extra $25,000 of insurance applied for on August 3, and this suit followed.

The district court held that the agent's failure when he sold the original policy to mention the 60-day waiting period after marriage was not actionable but that the receipt the agent issued on August 3 estopped the company to enforce the conditions of the "Guaranteed Insurability" rider. We agree that there was no actionable omission at the time of the original sale. An insurance company is not "estopped from reliance on the exclusion in the policy because the agent did not specifically explain the exculsion.... [T]he failure of an agent to review each provision of the policy does not operate to eliminate those provi-

---

* Hon. Robert A. Grant of the Northern District of Indiana, sitting by designation.

sions not specified from the policy." *State Farm Mutual Automobile Ins. Co. v. Xaphes*, 384 F.2d 640, 642 (2d Cir.1967); see also *Hanover Ins. Co. v. Hawkins*, 493 F.2d 377, 381–82 (7th Cir.1974); *Farber v. Great American Ins. Co.*, 406 F.2d 1228, 1233 (7th Cir.1969).

 It is true that courts in Indiana and elsewhere, realizing that many people do not read their insurance policies and, perhaps even more important, do not do so because the policies are unreadable, have held that the agent's oral representations at the time of sale can override the written terms of the policy. See *Vernon Fire & Casualty Ins. Co. v. Thatcher*, 152 Ind. App. 692, 707–12, 285 N.E.2d 660, 669–72 (1972); *Special Jet Services, Inc. v. Federal Ins. Co.*, 643 F.2d 977, 982 and n. 7 (3d Cir.1981). If the agent insists to the prospective purchaser that the policy will insure against a hazard, say being eaten by a shark, that the prospect is particularly concerned about, and the hazard materializes, the company may be estopped to plead the terms of the policy because the strength of the agent's oral assurances lulled the prospect into not reading, or reading inattentively, dense and rebarbative policy language. So if when agent Westgate had explained the "Guaranteed Insurability" rider Stephen Burns or his mother had asked whether the insurance proceeds would be collectable even if he died the day after the marriage, and Westgate had answered that they would be, Mrs. Burns would have an argument that the agent's misrepresentation had bound the company; and the argument would be hardly weakened if the Burnses, instead of asking, had stated that this was their understanding and the agent had said nothing.

 But that is not what happened. The agent communicated the gist of the "Guaranteed Insurability" rider, merely omitting details unlikely to be material to the purchaser. Stephen Burns was at the time a young man in good health who the agent would not have reason to assume would be concerned that should he get married he might die within the 60 days following the marriage. So even if we assume that *any* material omission by an agent imposes liability on the insurance company regardless of the actual terms of the policy (but see, e.g., *Travelers Ins. Co. v. Morrow*, 645 F.2d 41, 44 (10th Cir.1981)), the company would not be liable here because the omission was not material. And the assumption may be untenable in the circumstances of this case. The "Guaranteed Insurability" rider is short and refreshingly lucid, and even a cursory reading could not fail to reveal the 60-day waiting period. Cf. *Storms v. United States Fidelity & Guaranty Co.*, 118 N.H. 427, 430–31, 388 A.2d 578, 581 (1978). There is, incidentally, no evidence that Stephen did *not* read the policy; and if he did read it he could not have been misled by the agent's failure to mention the waiting period, even if the period had been material to him.

The rule urged by the plaintiff is that any time an insurance agent says anything about the contents of the policy he must recite all the conditions in it; otherwise they will not be enforceable. This would not be a reasonable burden to place on insurance companies, and it would go beyond what is necessary to protect the buyer of an insurance policy from being misled about the policy's contents by an overzealous insurance agent.

 We come then to the receipt of August 3. It was, of course, the wrong receipt. But it is inconceivable that any of the recitals in it were what induced Mrs. Burns to part with her $27.95. She knew that Stephen was dying of leukemia; the signature on the application is that of a dying, or at any rate a gravely ill, man. She must have known he was insurable, if at all, only under the "Guaranteed Insurability" rider—there was no other conceivable reason for giving Stephen's marriage certificate to agent Westgate. Certainly nothing on the face of the receipt suggests that it might reduce the 60-day period. On the contrary, with mordant irony in the circumstances, the form requires that the applicant be in good health. There can be no basis for any inference, which would be

fantastic, that Westgate had either actual or apparent authority, or intended, to waive the 60-day requirement. The company of course had no interest in selling life insurance to Stephen; nor did Westgate, even if he, though an employee of the company rather than an independent agent, gets a cut of the premium income he generates. The sale of the additional insurance to Stephen was unlikely to generate any premium beyond the first. The company would not congratulate Westgate for closing a deal on which the company would lose $24,972.05.

The Burnses could not have thought that the company was waiving the 60-day requirement. Rather, they hoped Stephen would live to the sixtieth day, knowing that if he did the company would have to pay Mrs. Burns the additional $25,000. He came very close to doing so. But the Burnses could not have thought that if he failed to comply with the conditions of the "Guaranteed Insurability" rider the company would nevertheless be obligated to pay up as if he had complied. Consistently with the view that the transaction was the purchase in effect of an option, the company offered to return the premium payment to Mrs. Burns when Stephen's death before the sixtieth day made the rider inoperative.

Nor were there any misrepresentations that might estop the company to assert its rights under the original policy. If Westgate had told the Burnses that he was waiving the 60-day survival period or (fantastically) that the company considered Stephen a good risk for a new life insurance policy, we might, conceivably, be presented with a different case. There is no contention that Westgate said anything of the sort.

We disagree with the district court's suggestion that since the standard application form contains conditions (for example, that the insured be in good health) not contained in the "Guaranteed Insurability" rider, the insurance company by tendering the form was attempting to modify the rider unilaterally by imposing additional (and unfulfillable) conditions. Even if this had been Westgate's or his employer's nefarious design (of which there is no hint in the record), it could not have harmed the Burnses in the circumstances of this case. The application was rejected because a condition in the rider was not satisfied, rather than because a condition (such as good health) appearing on the form was not satisfied. The agent's use of the standard form as a receipt for the Burnses' application under the rider, a use that misled no one, provides no reason for refusing to enforce a perfectly valid condition in the rider. Not to enforce it would be unfair to the defendant and the defendant's other policy holders, whose rates are geared to its loss experience.

Finally, since the standard form was used to activate the rider rather than to apply for a new insurance policy, the Indiana "temporary insurance" cases, such as *Kaiser v. National Farmers Union Life Ins. Co.*, 167 Ind.App. 619, 339 N.E.2d 599 (1976), are not in point. Those cases bind the insurance company after receipt of the first premium and until it notifies the insured that he has failed to meet one of the conditions of insurability. The rationale is that if the company had no such interim obligation the applicant would have received nothing in exchange for his premium, when he thought that by paying the premium before receiving the policy he was obtaining immediate, though temporary, insurance. See 2 Couch on Insurance 2d § 14.42, at pp. 88–92 (rev. ed. 1984). The Burnses were not buying temporary insurance with their $27.95 premium; what they were buying (actually with just the foregone interest on the premium, since the company refunded the premium itself after Stephen died)—and buying cheaply—was a valuable option.

■ The case was decided below on summary judgment and we must decide whether to reverse with directions to enter judgment for the company (which had also moved for summary judgment) or to remand for trial. There are no disputed facts, in the sense of what was said and done; only the inferences to be drawn are

disputed. Ordinarily inferences as well as elementary facts are for the jury, but on the undisputed facts of this case no rational jury could infer breach of contract or material misrepresentation by the company and the company therefore is entitled to summary judgment. See, e.g., *Collins v. American Optometric Ass'n,* 693 F.2d 636, 639–42 (7th Cir.1982); *Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Cos.,* 682 F.2d 660, 663 (7th Cir.1982); *Weit v. Continental Illinois Nat'l Bank & Trust Co.,* 641 F.2d 457, 464 (7th Cir.1981).

The judgment is reversed with directions to enter judgment for the defendant.

GRANT, Senior District Judge, dissenting.

I respectfully dissent from the majority opinion in this case because I believe that it inadequately addresses the real issue which confronts us.

It is clear—as the district court concluded—that there was no actionable fraud on behalf of defendant, Rockford Life Insurance Company. This is a simple issue which merits, at best, brief discussion. Rather, the real issue in this case is the legal effect of the erroneous temporary insurance receipt which defendant, Rockford Life Insurance Company, proffered to the plaintiff.

The terms of the temporary insurance receipt materially differed from the terms of the "guaranteed insurability" rider. Despite these differences, the majority opinion suggests that no one was misled by the insurance company's use of the incorrect receipt:

> ... The agent's use of the standard form as a receipt for the Burnses' application under the rider, *a use that misled no one,* provides no reason for refusing to enforce a perfectly valid condition in the rider.

*Majority Opinion* at 545 (emphasis supplied). This statement conflicts, however, with Mrs. Burns' affidavit which provides:

> ... Rather, because he [the insurance agent] wrote out the application and also because he accepted the initial premium, I believed the additional insurance was in effect as of August 3, 1979.

This statement indicates that Mrs. Burns believed—and reasonably so—that the additional insurance was to go into effect immediately.

The majority opinion continues:

> ... *Not to enforce it* [the provision of the rider] *would be unfair to the defendant* [insurance company] and the defendant's other policy holders, whose rates are geared to its loss experience.

*Majority Opinion* at 545 (emphasis supplied). While unfairness will certainly result to the defendant, enforcing the terms of the "guaranteed insurability" rider is even more unfair to the plaintiff. Presently before this Court are two culpable parties: one, an insurance company which issued an incorrect temporary insurance receipt and the other, an ordinary individual who failed to read or understand the fine print of the "guaranteed insurability" rider in the original policy.[1] The majority would impose a duty upon the general public to read and understand the fine print of insurance contracts while, at the same time, not requiring insurance companies, despite their bevy of attorneys, to read the receipts they issue, or know the law which will be applied to such insurance receipts, i.e., *Kaiser v. National Farmers Union Life Insurance Co.,* 167 Ind.App. 619, 339 N.E.2d 599 (1976).

I would hold that the issuance of the temporary insurance receipt with terms which materially differed from the provisions of the "guaranteed insurability" rider

---

**1.** The majority opinion suggests that "The 'Guaranteed Insurability' rider is short and refreshingly lucid, and even a cursory reading could not fail to reveal the 60-day waiting period." *Majority Opinion* at 544. This simply assumes too high of a legal expertise on behalf of ordinary individuals and is little more than an ivory tower approach to reality. Most individuals do not read their insurance policies because they do not understand them. I do not find the guaranteed insurability rider in this case particularly lucid or short. Indeed, it is one and a half pages out of the fifteen which constitute the insurance contract.

created an ambiguity which must be resolved against the insurance company. "... [I]n the case of ambiguity, that construction of the policy will be adopted which is most favorable to the insured." *Mutual Life Insurance Co. v. Hurni Packing Co.*, 263 U.S. 167, 174, 44 S.Ct. 90, 91, 68 L.Ed. 235 (1923). "The insurance company which writes the policy *and accompanying documents* has the power to articulate clearly the meaning of the terms and provisions used. Any confusion which results from the wording chosen by the company will be resolved in favor of the insured." *The Manufacturers Life Insurance Company v. Capitol Datsun, Inc.*, 566 F.2d 354, 358 (D.C.Cir.1977) (emphasis added). Indiana courts uniformly follow this principle. *Nationwide Mutual Insurance Company v. Neville*, Ind.App., 434 N.E.2d 585 (1982); *Farmers Mutual Aid Association v. Williams*, 179 Ind.App. 514, 386 N.E.2d 950 (1979); *Great Horizons Development Corporation v. Massachusetts Mutual Life Insurance Co.*, 457 F.Supp. 1066 (N.D.Ind.1978), *aff'd by unpublished opinion*, 601 F.2d 596 (7th Cir. 1979); *Jeffries v. Stewart*, 159 Ind.App. 701, 309 N.E.2d 448 (1974); *State Farm Fire & Casualty Co. v. Ackerman*, 151 Ind.App. 464, 280 N.E.2d 332 (1972); *United States Fidelity and Guaranty Co. v. Baugh*, 146 Ind.App. 583, 257 N.E.2d 699, 717 (1970) ("Where there is such ambiguity in the policy that the policy is doubtful in meaning or ambiguous or susceptible of two constructions, ... it is the duty of the jury to place the construction upon the language most favorable to the plaintiff [insured] and to resolve any doubt or ambiguity against the insurance company.")

The test under Indiana law whether ambiguity exists is "whether ... reasonably intelligent persons, on reading the contract, could honestly differ as to its meaning." *Great Horizons Development Corp.*, 457 F.Supp. at 1077. The test is not met merely because a controversy exists and one party asserts a certain interpretation while another denies it. *O'Meara v. American States Insurance Company*, 148 Ind.App. 563, 268 N.E.2d 109 (1971).

In this case, there is a clear conflict between the terms of the rider which allowed the insured to purchase additional life insurance, regardless of his health, and the conditional insurance receipt which Agent Westgate issued to the insured when he decided to exercise his rights under the rider. This conflict clearly creates an ambiguity with respect to which, as the present lawsuit indicates, reasonably intelligent people could differ.

In light of *Kaiser v. National Farmers Union Life Insurance Company*, 167 Ind. App. 619, 339 N.E.2d 599 (1976) and its progeny, I would hold that the issuance of this temporary insurance receipt created a valid and enforceable insurance contract between Mrs. Burns and the Rockford Life Insurance company. The principle of *Kaiser* is that "Where ... a receipt is issued by a life insurer and the receipt is supported by consideration, a contract is created. Any conditions contained in the receipt are to be treated as conditions subsequent thereby compelling an insurer to act affirmatively or negatively on the application." *Kaiser*, 399 N.E.2d at 604. As Judge McNagny stated in *Meding v. Prudential Insurance Company of America*, 444 F.Supp. 634, 636 (N.D.Ind.1978):

> *Kaiser* represents the strong public policy in Indiana which prohibits insurers from accepting premiums and then conditioning the receipts to prevent the insurer from incurring any risk during the period which it retains an applicant's premium, and during which an applicant might have reason to believe he was insured.

Here, defendant, Rockford Life Insurance Company, issued a conditional insurance receipt for consideration which reasonably led Mrs. Burns to believe that her son was insured. Since the insured died prior to notification of acceptance or rejection of the insurance contract by defendant, Rockford Life Insurance Company, I conclude that *Kaiser* is applicable to the facts of this case and that the defendant, Rockford Life Insurance Company, is liable to Mrs. Burns

for the policy amount. I would affirm the district court.