The MONARCH INSURANCE COMPANY OF OHIO, for itself and as subrogee of Piper Acceptance Corp., Plaintiff,

v.

David SIEGEL; L & S Equipment, Inc.; Jack Harmon; Pamela Harmon; Ora Ackerman; George Cokinos; and Judy Cokinos, Defendants.

Civ. No. F 84–81.

United States District Court, N.D. Indiana, Fort Wayne Division.

Jan. 2, 1986.

Stephen P. Kenney, Chicago, Ill., Thomas M. Kimbrough, Fort Wayne, Ind., for Monarch & Crump Aviation.

James H. Hanson, Indianapolis, Ind., for George & Judy Cokinos.

Ralph R. Blume, Fort Wayne, Ind., for Dickens & Co. and Terry Campton.

Gary M. Cappelli, Fort Wayne, Ind., for Ora & Barbara Ackerman.

John C. Grimm, Auburn, Ind., for George & Judy Cokinos and Gary & Teri Payne.

Neil F. Sandler, Frederick A. Beckman, Fort Wayne, Ind., for David Siegel & L & S Equipment.

John F. Townsend, Jr., Indianapolis, Ind., G. Stanley Hood, Fort Wayne, Ind., for Jack & Pamela Harmon.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on motions for summary judgment filed by the plaintiff ("Monarch"), defendant and third party plaintiff L & S Equipment, Inc. ("L & S"), third party defendant Crump Aviation Underwriters ("Crump"), third party defendants Terry Campton ("Campton") and

Dickens and Company ("Dickens"); and cross motions by defendants and third party defendants Jack and Pamela Harmon ("Harmon"), George and Judy Cokinos ("Cokinos"), and Gary and Teri Payne ("Payne"). For the following reasons, the motions for summary judgment filed by Monarch, Crump, the Harmons, the Cokinoses and the Paynes will be granted, the motion filed by L & S will be granted in part and denied in part, and the motion filed by Campton and Dickens will be denied.

This case arises out of the struggle to determine liability in the aftermath of a plane crash during an attempted landing at the Indianapolis International Airport in February, 1983. Monarch, as named insurer of the aircraft, sued L & S and David Siegel ("Siegel"), the owners of the plane and the insured under the policy, as well as the pilot Ora Ackerman ("Ackerman") and the passengers of the plane, claiming no liability under the policy. Cross-claims and this set of motions have now followed.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, summary judgment serves as a vehicle with which the court "can determine whether further exploration of the facts is necessary." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975).

In making this determination, the court must keep in mind that the entry of summary judgment terminates the litigation, or an aspect thereof, and must draw all inferences from the established or asserted facts in favor of the non-moving party. *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985). The non-moving party's reasonable allegations are to be accepted as true for purposes of summary judgment. *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1218–19 (7th Cir.1984). A party may

not rest on the mere allegations of the pleadings or the bare contention that an issue of fact exists. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See also Atchison, Topeka & Santa Fe Railway Co. v. United Transportation Union*, 734 F.2d 317 (7th Cir.1984); *Korf v. Ball State University*, 726 F.2d 1222 (7th Cir.1983). *See generally* C. Wright, *Law of Federal Courts*, § 99 (4th ed. 1983); 6 *Moore's Federal Practice*, § 56.15 (2d ed. 1984).

Thus, the moving party must demonstrate the absence of a genuine issue of material fact. Even if there are some disputed facts, where the undisputed facts are the material facts involved and those facts show one party is entitled to judgment as a matter of law, summary judgment is appropriate. *Egger v. Phillips*, 710 F.2d 292, 296–97 (7th Cir.1983); *Collins v. American Optometric Assn.*, 693 F.2d 636, 639 (7th Cir.1982). *See also Bishop v. Wood*, 426 U.S. 341, 348, 348 n. 11, 96 S.Ct. 2074, 2079, 2079 n. 11, 48 L.Ed.2d 684 (1976).

Based upon these foregoing principles, the facts of this case are as follows. In September, 1982, Siegel and L & S owned a Piper Turbo Seminole aircraft, and carried insurance on the craft. The insurance policy was issued by Global Aviation Insurance. The policy had been obtained through Campton, who worked as an insurance broker for Dickens.

On September 10, 1982, Siegel and Campton discussed whether it would be possible for Ackerman to fly the aircraft under the Global policy. Siegel told Campton that Ackerman had logged 250 hours of multi-engine flight time. Campton spoke with Global officials, who informed him that, with Ackerman's experience as represented by Siegel, Ackerman could qualify for coverage under the Global policy if he logged five additional hours of instruction on the Piper Turbo Seminole. However, at the time of the September 10, 1982 conversation, Ackerman had logged far fewer hours

than Siegel represented. In fact, at the time of the accident in February, 1983, Ackerman had logged only 137 hours as pilot in command of a multi-engine craft. Also at that time, Ackerman had logged a total of 9.4 hours in the Piper Seminole, only 2.4 hours of which were as pilot in command.

In January, 1983, L & S and Siegel went looking for a cheaper aviation insurance policy. They came to Campton, who located a policy issued by Monarch and underwritten by Crump which would fulfill their needs. L & S and Siegel cancelled the Global policy and took out the Monarch policy, and set the effective coverage period as January 25, 1983 to January 25, 1984.

Campton sent Siegel a letter on January 26, 1983, notifying him that he had obtained the Monarch policy and asking Siegel to complete and return an enclosed application. The application indicated that the aircraft covered under the policy would be used for "Private business and pleasure;" the box for "rental" use was not checked off. Siegel signed and returned the application.

The Monarch policy itself contains important restrictions which are relevant here. As to pilot qualifications, the policy required that a pilot have "a minimum of 1,000 total logged flying hours, including at least 250 hours as pilot in command of a multi engine Aircraft," with not less than 25 hours in the "same make and model aircraft as the insured craft." These provisions are spelled out in summary form on the application Siegel signed. The policy also included a specific exclusion from coverage for "any operation for which a charge is made," which is consistent with the fact that the application did not have the "rental" use box checked off.[1]

The Harmons, Paynes, Cokinoses, and Ackerman and his wife all operate Amway distributorships which are independent from, and compete with, each other. In February, 1983, a "Winners Circle Seminar" was held in Memphis, Tennessee at which sales promotion marketing techniques were to be discussed. Therefore, Ackerman, Jack Harmon, Gary Payne and George Cokinos boarded the Piper Seminole for the purpose of flying down to the seminar. Ackerman piloted the plane, and he and the other three passengers agreed to split a $46 per hour charge for using the plane. During an attempted landing at the Indianapolis International Airport, Ackerman's admitted negligence caused the plane to crash, damaging the plane's hull and injuring the passengers.

The various motions now before the court are attempts to determine who is liable for the damages caused in the crash. Monarch filed this suit seeking a declaratory judgment that its policy does not cover these damages, both because Ackerman failed to meet the pilot qualification provisions of the policy and because the plane was being used for rental purposes. Monarch's and Crump's motion for partial summary judgment address the issue of these policy exclusions, and the court deals with these motions in Part I of this order.

L & S has filed cross-claims against the other defendants, as well as third party claims against Campton and Dickens. The motion for summary judgment filed by L & S seeks to impute the admitted negligence of Ackerman to the passengers in the plane via a theory of common enterprise. This theory views the fact that because the passengers were all going to the same seminar for the same reasons as Ackerman, they engaged in a common enterprise so that negligence by one member of the common effort can be imputed to all. L & S then seeks to impute this imputed negligence of

---

1. As Campton pointed out in his letter to Siegel which accompanied the application:

    The information contained in the application is required by the insurance carrier as the basis for policy insurance. The description of coverage is, however, necessarily abbrieviated and all coverage is subject to the terms and conditions of the policy and endorsements currently in use by the underwriter company. Thus, the application does not control for purposes of determining coverage. However, the consistency between the application and policy strongly suggests that Siegel knew or should have known of these coverage restrictions.

the passengers to their wives via principles of partnership law. The Harmons', Paynes' and Cokinoses' cross-motions for summary judgment seek judgment against L & S on these same two issues. These motions are dealt with in Part II of this order.

Finally, Campton and Dickens seek summary judgment as against L & S and Siegel because the efforts made to secure the Monarch policy were not negligent and that the policy's provisions exclude coverage. This motion is dealt with in Part III of this order.

### I. Insurance Company Liability

The Monarch and Crump motion[2] for partial summary judgment seeks a ruling that no coverage for the February 13, 1983 crash exists because of two coverage defenses concerning pilot qualifications and the use of the aircraft, as well as a determination that neither Campton nor Dickens were agents of Monarch or Crump. The court will consider each of these aspects of the motion separately, beginning with the issue of Campton's and Dickens' agency.

### A. Campton and Dickens as Monarch's Agent

■ An essential part of Siegel and L & S' defense is that Campton and Dickens were agents of Monarch and Crump, so that certain representations and negligent acts can be attributed to their principals. Monarch, on the other hand, argues that Campton and Dickens were insurance brokers, not its agent, and that if any agency relationship existed, it was between Campton and Siegel.

Under Indiana law, one who represents or procures insurance through several companies is considered to be an insurance broker. *Stockberger v. Meridien Mutual Ins. Co.,* 182 Ind.App. 566, 395 N.E.2d 1272, 1278 (1979); *Augustine v. First Fed. Sav. & Loan of Gary,* 270 Ind. 238, 384 N.E.2d 1018, 1021 (1979); *Automobile Un-*

*derwriters, Inc. v. Hitch,* 169 Ind.App. 453, 349 N.E.2d 271, 276 (1976). The negligence of a broker cannot be imputed to the insurer, *Stockberger,* 395 N.E.2d at 1278; *Hitch,* 349 N.E.2d at 276, because the broker is viewed as an "independent contractor" working for the insurer. *Hitch,* 349 N.E.2d at 276.

It is undisputed that Campton (and hence his employer, Dickens) procured insurance from several companies. Perhaps the best evidence of this comes from Campton's dealings with Siegel and L & S. Campton first procured a policy from Global and then cancelled that policy in favor of the Monarch policy. Therefore, Campton and Dickens were insurance brokers.

Thus, any negligence by Campton and Dickens cannot be imputed to Monarch. Likewise, any statements made about the Monarch policy would not bind Monarch because Campton and Dickens were not its agents, but rather were independent contractors.

### B. Coverage Defenses

■ Monarch offers two policy exclusions to support its contention that the Monarch policy does not cover the February 13, 1983 accident. The first exclusion relates to pilot qualifications:

Pilots: The coverage afforded by this policy shall not apply unless the aircraft is operated in flight by the following pilots warranted they hold valid and effective pilot and medical certificates with ratings as required by the Federal Aviation Administration for the flight involved: David Siegel and, any private or commercial pilot, with a multi-engine land and instrument rating, with a minimum of 1,000 total logged flying hours, including at least 250 hours as pilot in command of a multi-engine aircraft, of which not less than 25 hours shall have

---

**2.** L & S has not filed a brief in opposition to Crump's motion for partial summary judgment, and at the October 24, 1985 hearing on the motions in this case, L & S indicated that sum-

mary judgment could be granted as to Crump. The court will therefore grant partial summary judgment as to Crump, and consider this motion only as it relates to Monarch.

been in the same make and model and aircraft as insured.[3]

When interpreting the provisions of an insurance policy a court cannot extend the coverage delineated by clear and unambiguous language in the insurance contract. *Utica Mutual Insurance Co. v. Ueding*, 175 Ind.App. 60, 370 N.E.2d 373, 376 (1977), citing *Ely v. State Farm Mutual Automobile Insurance Co.*, 148 Ind.App. 586, 268 N.E.2d 316 (1971). If ambiguities in the interpretation of an insurance policy exist courts will adopt the construction most favorable to the insured, *State Farm Fire & Casualty Co. v. Ackerman*, 151 Ind.App. 464, 280 N.E.2d 332 (1972), but courts have held that a failure to satisfy the pilot qualification and experience requirements contained in a policy in one or more particulars precludes coverage. *See Ideal Mutual Ins. Co. v. Limerick Aviation Co.*, 550 F.Supp. 437, 441 (E.D.Pa.1982); *Disanto v. Enstron Helicopter Corp.*, 489 F.Supp. 1352, 1365 (E.D.Pa.1980); *Master Feeders II, Inc. v. United States Fire Ins. Co.*, 17 Av.L.Rep. 18,205, 18,206 (10th Cir.1983) (CCH).

There is no dispute that Ackerman did not meet the pilot qualification provision of the Monarch policy; his 137 hours fell far short of the 250 hours required, and his logs showed only 2.4 hours as pilot in command of a Piper Seminole, well below the required 25 hours. Siegel and L & S attempt to claim that this written provision of the policy was altered by Camptons' representations in September, 1982 that Ackerman could qualify for coverage under the Global policy if he obtained five additional hours of training.

There are several problems with Siegel and L & S' position. First and foremost, Campton was not Monarch's or Crump's agent, as noted above. Thus, whatever Campton may have said about Ackerman's qualifications does not bind either Monarch or Crump, and cannot alter the clear language of the policy.

Second, the September, 1982 discussions were about coverage under the *Global* policy. The fact that an official at Global told Campton that Ackerman could qualify for coverage if he received five additional hours of instruction is completely irrelevant to what Ackerman would need to do to qualify under the Monarch policy. Certainly, officials of Global cannot bind Monarch or Crump.

Third, the "five hours of additional instruction" comment made by Campton was based on untrue assumptions about Ackerman's experience.[4] Siegel (perhaps unwittingly) represented that Ackerman had 250 hours of flight time in a multi-engine aircraft. A careful examination of Campton's notes, attached to the memorandum in opposition filed by L & S and Siegel, indicates that Campton spoke to Siegel, who told him that Ackerman had "1,350 total hours, 250 multi-engine hours (all of this time in a Geronimo) 250 retractable gear hours and 0 hours in [the Piper Seminole]." The notes also reveal that Campton spoke to Tom Canavera at Global, and that *"based on the hours reported by David Siegel ...* Tom Canavera said he would be willing to add Ora Ackerman to the policy *... based on the above hours,* provided Ora Ackerman

3. The application signed by Siegel contained very similar language, clearly stating that any pilot other than Siegel must have "1,000 total logged flying hours, including at least 250 hours as pilot in command of a multi engine aircraft, of which not less than 25 hours shall have been in the same make and model aircraft as insured."

4. At the October 24, 1985 hearing on this motion, L & S and Siegel referred to *Proprietors Ins. Co. v. Northwestern Natl. Bk. of Minneapolis,* No. C3-85-707 (Minn.Ct.App. Oct. 1, 1985), an opinion which held that an unintentional misrepresentation of the number of hours of flight experience is not a basis for denying

coverage to a named insured. The significance of that case is questionable here; *Proprietors Ins. Co.* involved the application of Minnesota statutes *which do not control here,* and involved the policy's coverage of a *named* insured, whom the insurance company should be aware of, as opposed to coverage under an open pilot provision where the actual amount of experience is determinative of whether a pilot qualifies. After mentioning the case, L & S and Siegel have not argued its applicability to this motion—indeed, the only briefing on the case comes from Monarch. The court concludes that the case is inapposite here.

received 5 hours of dual instruction ..." (emphasis added). However, the premise behind requiring only five hours of instruction—that Ackerman had 250 hours in a multi-engine plane—was not true. It is doubtful—or at least unclear—that coverage could have been had with the five hours of instructions given the true extent of Ackerman's experience in multi-engined planes.

Fourth, the application for the Monarch policy which Siegel signed clearly set out the 250 total/25 same model hourly requirements of the policy. Nothing in the application indicated that Ackerman would be covered, and no evidence has been offered to show that such an agreement was orally reached or understood. Siegel and L & S claim that Campton was negligent for failing to warn them that Ackerman would not be covered by the Monarch policy, but because Campton was not Monarch's agent, this negligence cannot be imputed to Monarch.

Thus, it is clear that the representations concerning coverage for Ackerman under the Global policy do not act to waive or alter the pilot qualification provisions of the Monarch policy. There is no factual dispute that Ackerman did not meet those qualifications, and thus Monarch is entitled to a judgment as a matter of law that the Monarch policy does not cover the February 13, 1983 accident.

The second policy coverage defense relates to the rental use of the Piper Seminole. The Monarch policy was issued for "Pleasure and Business," defined by the policy as "personal and pleasure use in direct connection with the Insured's business, excluding any operation for which a charge is made."

Courts interpreting insurance contracts containing similar language about "charges" for operation of an insured vehicle tend to distinguish between a payment which merely reimburses for direct operating costs and a payment which includes some amount beyond the direct operating expenses. *See Pacific Indemnity Co. v. Acel Delivery Service, Inc.,* 485 F.2d 1169, 1172 (5th Cir.1973), *cert. denied,* 415 U.S. 921, 94 S.Ct. 1422, 39 L.Ed.2d 476 (1974); *Houstin Fire & Casualty Ins. Co. v. Ivens,* 338 F.2d 452, 455 (5th Cir.1964); *Flagstaff Mortuary, Inc. v. Gamble,* 135 Ariz. 474, 662 P.2d 149, 151–52 (Ariz.App. 1983); *Kohler v. Proprietors Ins. Co.,* 394 So.2d 463, 464 (Fla.App.1981). Under these cases, mere reimbursements are not "charges," while payments including an amount beyond direct operating costs are viewed as "charges," even though there is no "profit" made. *Pacific Indemnity,* 485 F.2d at 1172.

Here, Ackerman agreed to pay Siegel and L & S $46.00 per hour to use the aircraft, in addition to direct operating costs of gas and oil. Siegel admitted in his deposition that the $46.00 per hour charge was designed to cover things like a maintenance reserve for the plane and the cost of annual inspections, neither of which appear to be "direct" operating expenses like fuel costs. In addition, L & S and Siegel allege in several pleadings that the aircraft was "rented" or "leased" to Ackerman. These admissions clearly establish that the $46.00 per hour fee was a "charge"—that is, a payment beyond direct operating costs—which takes the February 13, 1983 use of the plane outside of the limits of the "Pleasure and Business" use provision of the Monarch policy.

L & S and Siegel respond to this argument in two ways: (1) they claim that the provision at issue "is not mentioned in the binder, [and] the policy was not delivered to L & S until March 14, 1983 (a month after the loss)," apparently believing that they are not bound by a provision of the policy that they did not know existed; and (2) they claim that Campton failed to tell them about the exclusion of rental use. As to the second response, Campton's failure to warn them cannot be imputed to Monarch because he was not its agent. Even if he was its agent, he would not be required to recite all conditions in the policy lest they not be enforceable. Such a rule "would not be a reasonable burden to place on insurance companies...." *Burns v. Rockford*

*Life Ins. Co.,* 740 F.2d 542, 544 (7th Cir. 1984).

As to the first response, Siegel knew or should have known that the policy did not cover rental use; the rental use box on the application he signed was not checked off. Nor should Siegel and L & S be able to claim coverage under the policy without being bound by all the terms of the policy. The fact that they did not see the policy until March, 1983 does not alter the fact that they made the policy effective from January 25, 1983. An insured cannot pick and choose which policy provisions will apply or when they will apply; Siegel and L & S caused the *entire* policy to become effective on January 25, 1983.

Thus, Ackerman's use of the Piper Seminole on February 13, 1983 was a "rental use" of the aircraft, which fell outside of the "Pleasure and Business" limitation of the Monarch policy. Therefore, the Monarch policy does not cover the damages sustained in the February 13, 1983 accident.

The court will therefore grant partial summary judgment to Monarch, declaring that the Monarch policy in question here does not supply coverage over the aircraft accident and that Campton and Dickens were not the agents of Monarch and Crump.

## II. Passenger Liability

■ The cross-motions filed by L & S and the Harmons, the Paynes and the Cokinoses revolve around whether the passengers in the aircraft can have Ackerman's negligence imputed to them, and then whether this negligence can be imputed to the wives of the passengers and pilot by virtue of partnership law. The court will consider each of these issues in turn.

### A. Common Enterprise Liability for the Passengers

L & S argues that Ackerman and the passengers (Jack Harmon, Gary Payne and George Cokinos) were engaged in a "common enterprise" while on the trip to Memphis: they were all going to learn new sales techniques for their separate Amway distributorships, giving them a common business interest in "the profit they hoped to earn from increased sales of Amway merchandise."

Indiana courts recognize four basic elements to the establishment of a joint or common enterprise for purposes of imputing negligence:

(1) joint control over management and operation of the vehicle over the course and conduct of the trip (the "joint control" element);

(2) community of interest in the object and purpose of the undertaking, with equal right to govern movements and the conduct of each other (the "community interest" element);

(3) the community interest must be pecuniary in nature (the "pecuniary interest" element); and

(4) there must be a contract between the parties, either express or implied.

*Lafayette Bank & Trust Co. v. Price,* 440 N.E.2d 759, 762–63 (Ind.App.1982); *State v. Speidel,* 181 Ind.App. 448, 392 N.E.2d 1172, 1178 n. 7 (1979); *Serna v. Kiger,* 175 Ind. App. 566, 372 N.E.2d 1232 (1978).

The thrust of the cross-motions by the passengers in this case center on the community interest and pecuniary interest elements. The passengers allege that there was no *community* interest in the trip to Memphis; while Ackerman and the passengers were going for the same reason—to attend the seminar—the passengers were travelling for separate businesses that had no common interest in working together.

Indiana courts view a joint or common venture as "an association of two or more persons to carry out a single business enterprise for profit." *Lafayette Bank,* 440 N.E.2d at 762; *Beck v. Indiana Surveying Co.,* 429 N.E.2d 264, 268 (Ind.App.1981). The facts established in the affidavits indicate that Ackerman and the three passengers were not carrying out a single business in travelling to Memphis—in fact, they represented four separate businesses that directly compete against each other for

customers of Amway products. If one views the purpose of the flight as wanting to advance Amway businesses, one could hardly think of a more inappropriate factual situation to call a "community interest" than when four direct competitors get together.[5]

Even if the court were to view the common interest as simply wanting to get to Memphis, the common enterprise theory runs into problems with the pecuniary interest element. The *Lafayette Bank* court quoted and approved of the following language from Prosser:

> It is generally agreed that something more is required for a joint enterprise than the mere showing of a contract or agreement to travel together to a destination for a common purpose. Something in the nature of a common business, financial or pecuniary interest in the objective of the journey is said to be essential. In this form the requirement of a mutual interest persists as a minimum in all courts, to the exclusion of all cases in which the parties are casually together for pleasure or independent ends.

W. Prosser, *The Law of Torts*, § 72, 477–78 (4th ed. 1971). *Lafayette Bank*, 440 N.E.2d at 763. Thus, the mere desire to get to a common destination lacks a common business or pecuniary interest so that joint liability cannot exist. *Ackman v.*

*Bullard*, 161 Ind.App. 437, 316 N.E.2d 444, 446–47 (1974). *See also Serna v. Kiger*, 372 N.E.2d at 1234 (travelling to attend political convention lacks a pecuniary element); *Leuck v. Goetz*, 151 Ind.App. 528, 280 N.E.2d 847 (1972) (travelling to church social lacks pecuniary interest.[6]

Quite simply, these two elements of a joint or common enterprise claim require that the interest be common (that is, shared) and monetary. To the extent that Ackerman's interest was common with his passengers—because they wanted to get to Memphis in order to attend the seminar—the interest is not pecuniary or monetary in nature. To the extent Ackerman's interest and that of his passengers is monetary—to sharpen their marketing skills to make more Amway profits—their interests are not common. Therefore, L & S cannot establish a common enterprise between Ackerman and the passengers,[7] so that Ackerman's negligence cannot be imputed to the passengers.

### B. Liability for the Wives of the Passengers

L & S attempts to make the wives of the passengers liable by taking the negligence of Ackerman as imputed to the passengers and imputing it to the wives via principles of partnership law. The essential premise to this argument, however, is that Ackerman's negligence can be imputed

---

**5.** From an economic perspective, the antagonism of these interests is obvious—every dollar of profit earned by an Ackerman Amway sale is one less dollar of profit and one less sale available to the Harmons, Paynes, and Cokinoses. Thus, a trip to hone one's marketing skills is in effect a trip to learn how to make more profits and therefore make less profits available for one's competitors.

**6.** The cases cited by L & S are easily distinguished on this ground. In *Keck v. Pozorski*, 135 Ind.App. 192, 191 N.E.2d 325 (1963), negligence was imputed because husband and wife were riding to work to enhance the family finances, while in *Hake v. Moorhead*, 140 Ind. App. 127, 222 N.E.2d 617 (1967), husband and wife were travelling together to deposit funds in a joint bank account earned in a joint business. The key to these cases is that the pecuniary interest was common in the sense of being the same for both passenger and driver. Here,

while the passengers' interest is *similar* to Ackerman's in that all want to earn profits, the interest of each passenger is not the *same* as the interest of Ackerman; in fact, the interest is antagonistic because it is competitive. The California case cited by L & S, *Shook v. Beals*, 96 Cal.App.2d 963, 217 P.2d 56 (1950), is inapposite in that it applies California law.

**7.** The cross motions also suggest that the first element—joint control—is absent here. This element, derived from automobile cases, may not be directly applicable here. *See Lafayette Bank*, 440 N.E.2d at 763. To the extent it does apply, the court notes that Ackerman was the only person who could exercise control over the plane because he was the only pilot on board. That fact suggests it would be impossible for the passengers to have exercised any meaningful control over the management and operation of the plane.

to the passengers through a common enterprise theory. As the preceding section makes clear, no such imputation of negligence can be made. Therefore, there is no need to analyze the principles of partnership law advanced here as to Pamela Harmon, Teri Payne, and Judy Cokinos.

The claim against Barbara Ackerman, however, is different. The Amway distributorship run by Ackerman and his wife is a partnership under Indiana law, I.C. 23–4–1–6(1). Counsel for Ackerman admitted as much at the October 24, 1985 hearing. Indiana law states that partners are jointly and severally liable, I.C. 23–4–1–15, for a wrongful act of a partner acting in the ordinary course of business. I.C. 23–4–1–13. If Ackerman was negligent while acting in the ordinary course of his Amway business, then Barbara Ackerman is liable as well.

Here, Ackerman was flying the plane in order to go to the sales seminar in Memphis. While counsel argued that the seminar was not sponsored by Amway, it is clear that the techniques to be learned at the seminar would have a direct effect, and were admittedly intended to have an effect, on the Ackerman Amway distributorship. Precisely because Ackerman was negligent while trying to advance his Amway business, the court finds that Ackerman was acting within the ordinary course of his Amway business. Therefore, his partner Barbara Ackerman shares in his liability.

Thus, the court finds that Ackerman's admitted negligence cannot be imputed to the passengers or their wives because of the lack of a common or joint enterprise. Therefore, the motion filed by L & S must be denied as to the Harmons, Paynes, and Cokinoses, and the cross-motions will be granted. However, the L & S motion will be granted as to Barbara Ackerman, who shares in her husband's negligence by virtue of their partnership in their Amway distributorship.

### III. Insurance Agent Liability

■ The final motion for summary judgment is brought by Campton and Dickens against Ackerman, L & S and Siegel. Campton and Dickens seek to absolve themselves from liability under the Ackerman and L & S cross-claims on two grounds: (1) that the policy and application were sufficiently clear that Ackerman was not named and did not qualify for coverage, and so the policy's provisions control; and (2) Campton acted reasonably in procuring the Monarch policy. L & S and Siegel (and presumably Ackerman) oppose the motion on the grounds that Campton was negligent in failing to warn Siegel and L & S that Ackerman was not covered by the Monarch policy.

Indiana courts hold that

[a]n insurance agent or broker who undertakes to procure insurance for another is an agent of the proposed insured, and owes the principal a duty to exercise reasonable care, skill, and good faith diligence in obtaining the insurance ... If the agent undertakes to procure the insurance and through fault and neglect fails to do so, the agent or broker may be liable for breach of contract or for negligent default in the performance of a duty imposed by contract.

*Stockberger v. Meridian Mutual Ins. Co.*, 395 N.E.2d at 1279. A contract to procure insurance can be implied on the basis of prior dealings, *id.; Western Assurance Co. v. McAlpin*, 23 Ind.App. 220, 55 N.E. 119 (1899), but there is a duty on the part of the insured to provide the agent or broker with the information necessary to implement the policy, as an agent cannot be liable for an insured's loss due to the insured's own act or omission. *Stockberger*, 395 N.E.2d at 1279, citing 3 Couch, *Cyclopedia of Insurance Law*, § 25:60 (2d ed. 1964), and 72 A.L.R.3d 747 (1976).

Campton and Dickens argue that the insurance contract controls, and that Siegel's failure to seek to make corrections in either the application or the policy suggests full complicity in the terms of the policy as written. Of course, the language of the application or policy cannot be controlling here; L & S's position is that the language of the policy should have been different,

and Campton's negligence accounts for the fact that the policy reads as it does. The real issue raised by this case is whether Campton fulfilled his duty to Siegel in obtaining the Monarch policy at issue here.

The argument of L & S misses the mark here as well. It argues that Campton and Dickens cannot simply claim contributory negligence for Siegel's failure to read or correct the policy; however, it has a recognized duty to supply Campton with sufficient information so that the proper policy could be obtained. It claims that Campton has a duty to warn it that Ackerman was not covered, but its argument focuses on the degree of care Campton was required to exercise, which sounds more like the duty of reasonable care recognized in *Stockberger.*

The real issue here, as the court perceives it, is whether Campton, as the agent of L & S and Siegel, adequately discharged his duty in procuring the Monarch policy given the information that Siegel relayed to him. Cast in such a light, the issue is highly factual, as what Campton procured must be measured against what he was told or knew about.

The assertions of the parties make it clear that there is a factual dispute as to what Campton knew and what Siegel told him prior to the procurement of the Monarch policy. Campton and Dickens claim that Siegel only mentioned Ackerman during the September 10, 1982 conversation about coverage under the Global policy. If this were true, then it would appear that Campton had no special reason to believe that Ackerman should be included in the policy; Siegel may have been shopping around. According to Campton's phone notes, Siegel told Campton to add Ackerman to the policy, but that was clearly before Ackerman could have taken the five additional hours of instruction. If, as Campton claims, he heard nothing further about Ackerman—for example, that the five hours had been completed—he may well have been justified in leaving Ackerman out of the policy.

Siegel and L & S, on the other hand, contend that substantially more went on with Campton. L & S points to deposition testimony which it claims indicates that Ackerman spoke with Campton about his qualifications and about coverage for Ackerman's use of the aircraft. It claims Campton knew that Siegel wanted Ackerman to be able to use the plane, and that Campton, as an expert in aviation insurance, knew or should have known about certain aviation industry practices, including the rental of planes. If these facts were true, then Campton knew substantially more about Ackerman's involvement with Siegel, and perhaps should have known that whatever coverage was obtained or sought under the Global policy would be required in a request for "the same coverage" in the Monarch policy.

These disputed factual assertions leave the court unable to determine, under the principles of Rule 56 of the Federal Rules of Civil Procedure, what Campton knew and what Siegel told him concerning the coverage wanted under the Monarch policy. Therefore, Campton and Dickens' motion for summary judgment will be denied.

### Conclusion

For the reasons set forth above, the motion for partial summary judgment of plaintiff Monarch and third-party defendant Crump, the cross-motions for summary judgment filed by defendants Harmons, the Paynes, and the Cokinoses, are hereby GRANTED. The motion for summary judgment of defendant and third-party plaintiff L & S is hereby GRANTED as to Barbara Ackerman, but DENIED as to the Harmons, Paynes, and Cokinoses. The motion for summary judgment of third-party defendant Campton and Dickens is hereby DENIED.