In re Sigmund J. BECK, Trustee in Bankruptcy of Hughes & Associates Insurance Agency, Inc., Appellant,

v.

GENERAL ACCIDENT INSURANCE, a/k/a General Accident Insurance Company of America Appellee.

In re HUGHES & ASSOCIATES INSURANCE AGENCY, INC., Debtor.

Sigmund J. BECK, Trustee, Plaintiff,

v.

GENERAL ACCIDENT INSURANCE, a/k/a General Accident Insurance Company of America, Defendant.

No. IP 87–285–C.
Bankruptcy No. 8500996(B).
Adv. No. 85–0350.

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 26, 1990.

Matthew E. Wilkens, Thomas C. Scherer, Bamberger & Feibleman, Indianapolis, Ind., for plaintiff.

Lloyd T. Wilson, Bingham, Summers, Welsh & Spilman, Indianapolis, Ind., for defendant.

## ENTRY

BARKER, District Judge.

The appellant-Trustee seeks to overturn a bankruptcy court order denying the Trustee's Motion for Summary Judgment and granting General Accident's Cross-Motion for Summary Judgment. This court may review questions of law *de novo, Matter of Evanston Motor Co., Inc.*, 735 F.2d 1029 (7th Cir.1984); *In re Cricker*, 46 B.R. 229 (N.D.Ind.1985), but must accept the bankruptcy court's findings of fact unless they are clearly erroneous. Bankruptcy Rule 8013. In the present case, the parties do not contest the underlying facts.

*Background*

Hughes and Associates Insurance Agency, Inc. ("Agency") was an insurance broker that sold insurance policies for several insurance companies. On October 1, 1973, Agency executed an "Agency Agreement" ("Agreement") with General Accident Insurance Fire and Life Assurance Corporation, Ltd. ("General Accident"). Pursuant to the Agreement, Agency had the duty to "collect and receipt for, hold as fiduciary, and pay over" to General Accident all the premiums paid on General Accident policies.

Beginning in May 1984, Agency failed to forward the premiums collected for Gener-

al Accident. By December 28, 1984, Agency's account payable to General Accident totalled $36,435.58. To reduce this deficit, Hughes procured a $15,000 personal loan from Morris Plan [1], secured by a second mortgage on Hughes' home. Mr. Hughes deposited this $15,000.00 into Agency's general checking account, and on December 28, 1984, tendered a $15,000 check to General Accident.

On March 11, 1985, Agency, pursuant to an Agency Sales Agreement, sold its entire business to Mr. Haimes. The sale included all the insurance "expirations" [2] under policies issued by General Accident and other insurers, as well as books, records, customer lists, files, data, work in progress at the time of the effective date of the agreement, understandings and the good will of the debtor. In return, Haimes agreed to pay General Accident any amounts Agency owed General Accident as of February 1, 1985. Pursuant to the Agency sales agreement, Haimes paid General Accident $25,189.99. Of this amount, only $17,767.69 was paid on account of previously unremitted premiums. Both the $15,000 payment and the Haimes payment occurred within ninety (90) days of the date Agency filed its Chapter 7 bankruptcy petition.

On July 16, 1985, the Trustee commenced adversary proceedings against General Accident, alleging that General Accident received two transfers of the debtor's property within ninety (90) days of the date of bankruptcy and that both transfers were subject to being avoided as preferential transfers pursuant to section 547 of the Bankruptcy Code, 11 U.S.C. § 547.[3] The

---

1. The record does not disclose what type of financial institution Morris Plan is.

2. The term "expirations" refers to information concerning a particular insurance policy, such as the name and address of the insured, the location and description of the property insured, and the date the insurance policy expires. Insureds are more likely to change policies upon the expiration of existing policies, so knowledge of a policy's expiration date permits an agent to contact the insured just prior to the expiration to solicit renewal or procurement of a new policy. *See* Annotation, *Rights to Expirations as Between Insurer and Insurance Agent or Broker,* 88 A.L.R.3d 1142, 1145 (1978).

3. In pertinent part, Section 547 of the Bankruptcy Code provides:

(b) Except as provided in subsection (c) of this section [exclusions from trustee's avoiding powers], the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

Trustee moved for summary judgment on December 23, 1986, and General Accident filed a cross-motion for summary judgment. On February 27, 1987, the bankruptcy court denied the Trustee's motion for summary judgment and granted General Accident's cross-motion. (*In re Hughes & Associates Ins. Agency, Inc.,* 71 B.R. 92 (Bkrtcy.S.D.Ind.1987)). The bankruptcy court concluded that Agency was a special agent for General Accident, and that the Agreement imposed a fiduciary duty on Agency to collect and remit premiums. The bankruptcy court reasoned that because Agency held the premiums in trust, the premiums were not part of the debtor's property for purposes of section 547. *Cf. U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 208 n. 10, 103 S.Ct. 2309, 2313 n. 10, 76 L.Ed.2d 515 (1983). The bankruptcy court further ruled that the $15,000.00 payment and the Haimes payment involved trust property rather than property of the debtor, and therefore were not preferential transfers. Alternatively, the court ruled that the Haimes payment involved "earmarked funds" which were never part of the debtor's estate and therefore are nonavoidable.

*Discussion*

■■■ The first issue is whether the Agreement created a trust relationship between Agency and General Accident; the bankruptcy court correctly held that it did so. The existence of a trust is a matter of state law. *See, e.g., Matter of Gladstone Glen,* 628 F.2d 1015, 1017 (7th Cir.1980); *Matter of Georgia Steel, Inc.,* 56 B.R. 509, 516 n. 19 (Bkrtcy.M.D.Ga.1985); *In re Tap, Inc.,* 52 B.R. 271, 274 (Bkrtcy.D.Mass. 1985). In Indiana, an express trust is created by direct and positive acts of the parties as evidenced by an instrument wherein

the language expressly or by plain implication evinces an intention to create a trust. *Ross v. Thompson,* 128 Ind.App. 89, 146 N.E.2d 259 (1957). *See also Judd v. First Fed. Sav. and Loan Ass'n of Indianapolis,* 710 F.2d 1237 (7th Cir.1983) (applying Indiana law) (the principal consideration in determining the existence of a trust is the intent of the parties). The Agreement executed by Agency and General Accident imposed a duty on Agency to collect premiums for General Accident, and to hold them in a fiduciary capacity. The Agreement clearly demonstrates the parties' intent to create a trust.

■■■ A valid trust requires an existing res or trust fund. *Voelkel v. Tohulka,* 236 Ind. 588, 141 N.E.2d 344, *cert. denied,* 355 U.S. 891, 78 S.Ct. 263, 2 L.Ed.2d 189 (1957). Further, a contract to create a trust is merely a promise; no trust is created until a res exists. *Id.* Once Agency began to collect premiums for General Accident, a trust fund was created. The Trustee argues that no trust relationship arose between Agency and General Accident because their course of dealing was inconsistent with a trust. Specifically, the trustee notes that Agency commingled funds from disparate sources—including premiums received on General Accident policies—into a single general checking account. But neither the Agreement nor Indiana law required Agency to keep separate accounts, so that circumstance cannot preclude the existence of a trust.[4] The trustee also contends that under *Bushnell v. Krafft,* 133 Ind.App. 474, 183 N.E.2d 340 (1962), a debtor-creditor relationship will be found if the course of dealing between parties so indicates, even if the insurance company and its agent expressly contemplated a fi-

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;
    (5) that enables such creditor to receive more than such creditor would receive if—
      (A) the case were a case under Chapter 7 of this title;
      (B) the transfer had not been made; and
      (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

**4.** Moreover, a trustee commingling funds with his own funds and paying his own obligations from commingled funds is presumed to be acting honestly, and the amount remaining in the fund equal to the amount held in trust is presumed to belong to the trust fund. *Cf. Peoples State Bank v. Caterpillar Tractor Co.,* 213 Ind. 235, 12 N.E.2d 123, 126 (1938).

duciary relationship. The bankruptcy court correctly discounted this argument. *Bushnell* involved an action by a receiver of an insolvent insurance company against several agents to recover allegedly unearned *commissions*, rather than *premiums*. But *Bushnell* actually cuts against the trustee, because the determinative factor in that case was that commissions were not encompassed within the fiduciary relationship expressly created with respect to the premiums. In the present case, the Agreement specifically provides for a fiduciary relationship with respect to collected premiums. Thus *Bushnell* affords the trustee no relief.

■ The bankruptcy court was also correct in holding that Agency was a special agent under a fiduciary duty to collect, hold, and remit premiums to General Accident. A special agent is one who is authorized to do only specific acts pursuant to particular instructions or within certain restrictions. *Allegheny Mut. Cas. Co. v. Franklin*, 513 N.E.2d 658, 659 (Ind.Ct.App. 1987); *Farm Bureau Mutual Ins. Co. v. Coffin*, 136 Ind.App. 12, 186 N.E.2d 180, 182–83 (1962). The existence of an agency relationship is generally a question of fact except when, as here, the relationship is supported by a written agreement. *Metro. Real Estate Corp. v. Frey*, 480 N.E.2d 267, 269 (Ind.Ct.App.1985). The fact that Agency represented several insurance companies, and therefore was an insurance broker does not change the analysis, because an insurance broker can be considered a special agent for the purposes of delivering policies and collecting premiums. *Auto. Underwriters, Inc. v. Hitch*, 169 Ind.App. 453, 349 N.E.2d 271, 276 (1976); *see also Monarch Ins. Co. of Ohio v. Siegel*, 625 F.Supp. 693, 697 (N.D.Ind.1986).

Thus the bankruptcy court correctly ruled that Agency was a special agent for General Accident, and that Agency held collected premiums (from General Accident policies) in trust for General Accident. The bankruptcy court erred, however, in believing that it naturally followed from these rulings that the payments at issue were necessarily part of the trust fund, and therefore not "property of the debtor". The fact that a trust existed does not mean that the trust had an unlimited scope. The trust between Agency and General Accident existed only with respect to collected premiums, and cannot be construed to envelop any monies that somehow found their way into Agency's general checking account. Agency's commingling of funds lent its trust relationship with General Accident an inchoate nature, but did not endow the trust with amoeboid powers to swallow any funds that came into contact with it. To impress funds into its trust, General Accident should be able to identify the funds as coming from a source that necessarily contributed to the trust fund, in this case premium payments on General Accident policies. *See Pearce v. Dill*, 149 Ind. 136, 48 N.E. 788 (Ind.1897); *see also Slodov v. United States*, 436 U.S. 238, 255–56, 98 S.Ct. 1778, 1789–90, 56 L.Ed.2d 251 (1978).

■ In the present case there is no dispute as to where the money for the challenged payments came from. The $15,000 payment involved money Mr. Hughes obtained as a personal loan by securing a second mortgage on his house; it bears no connection to premium payments that Agency held in trust for General Accident. This money was never part of the contemplated trust fund, and thus was not trust property held by Agency on behalf of General Accident.[5]

■ Whether the Haimes payment involved trust property held by Agency for General Accident is a closer question. Of

---

5. General Accident cited *In re Rodriguez*, 50 B.R. 576 (Bkrtcy.E.D.N.Y.1985) and *In re Razorback Ready–Mix Concrete Co.*, 45 B.R. 917 (Bkrtcy.E.D.Ark.1984) for the proposition that a dissipated trust can be reinstated with funds unrelated to the trust. Those cases involved payments of taxes to the Internal Revenue Service (which were made within the preference period) pursuant to a statutory duty to collect taxes in trust under section 7501(a) of the Internal Revenue Code. The courts reviewed the legislative history of section 547, which stated that payments held in trust under section 7501(a) would not be a preference if they had been properly held for payment, and that any actual payments of taxes to the IRS would be deemed to have been properly held for payment. *See* House Report No. 95–595, 95th Cong., 1st Sess., pp. 372–73 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. The issues before the *Rodriguez* and *Razorback* courts were

the $25,189.99 that Haimes paid directly to General Accident, $17,767.69 was specifically assigned to liquidate the balance of Agency's unpaid premiums to General Accident. The remaining $7,422.30 purchased Agency's entire business, including its expirations. Again, the bankruptcy court seems to have assumed that these monies were trust property simply because there was a trust relationship between Agency and General Accident with respect to policy premiums.[6] First, the Agreement never contemplated that funds from the sale of the business would be held in trust for General Accident, so the $7,422.30 are not immune from avoidance on those grounds.[7] But what of the $17,767.69 that was allocated to cover the unpaid General Accident premiums? While both Agency and Haimes intended the money to represent the unpaid premiums, the money clearly did not come from General Accident policy holders. Agency squandered monies owed to more parties than just General Accident, and was not free to favor a particular party by structuring the sale of its business in a way that ensured satisfaction of that party's claims in preference to the claims of others. Like the $15,000 payment, the funds were contributed from sources other than General Accident policy holders, and were never part of the contemplated trust fund for premiums. Therefore the Haimes payment did not involve trust property.

■ The bankruptcy court did not err, however, in determining that the Haimes payment involved earmarked funds. A noted bankruptcy treatise discussed earmarked funds in the following way:

In cases where a third person makes a loan to a debtor specifically to enable him

to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created.

4 *Collier on Bankruptcy* ¶ 547.25 at 547–(101–102) (15th ed. 1986). As the Fifth Circuit observed, "[t]he earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily because the assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor's estate." *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1356 (5th Cir.1986); *see also In re Network 90°, Inc.,* 98 B.R. 821, 832 (Bkrtcy.N.D.Ill.1989). The definition above aptly describes the present circumstances. The monies Haimes paid to cover the unpaid General Accident premiums were never in Agency's control, nor did the payment compromise any other creditor's claims. But not all of the $25,189.99 Haimes paid to General Accident was earmarked. Only the $17,767.69 specifically allocated to the unpaid General Accident premiums was earmarked. Where earmarked funds are transferred, there is no increase or decrease of the debtor's assets. General Accident can hardly maintain that Agency's assets were not depleted by a sale that divested Agency of its entire business. Therefore the $7,422.30 Haimes paid for Agency's expirations, books, records, etc. cannot be considered as earmarked.[8]

The bankruptcy court did not reach the question of whether Agency or General Accident owned the expirations, or which parties had perfected security interests in

---

narrow, and were solely concerned with taxes held in trust for the IRS. The congressional policy they relied on applied only to tax monies, not to monies held in trust generally. The present involves neither taxes nor funds which the debtor had a statutory duty to hold in trust. Therefore *Rodriguez* and *Razorback* do not govern the present analysis.

6. The bankruptcy court's alternative holding—that the Haimes payment involved earmarked funds—will be discussed *infra.*

7. Furthermore, the trustee's powers cannot be circumvented by simply channeling the pay-

ment directly to General Accident instead of tendering the money to Agency.

8. Conversely, the $15,000 payment was not earmarked despite Hughes' intent that it be used to set off the debt to General Accident, because that money became property of the debtor's estate when it was paid into Agency's general checking account. Moreover, there is no evidence that the money was a loan by Hughes to Agency, so Agency was not simply "substitut[ing] ... one creditor for another." *Coral Petroleum, supra,* 797 F.2d at 1356. The $15,000 transfusion stemming from the second mortgage on Hughes' personal home is more analo-

the debtor's property. These issues remain open on remand.

The bankruptcy court's holding that a trust relationship existed between Agency and General Accident with respect to premiums paid by General Accident policy holders, and that Agency was a special agent to collect, hold, and pay over such premiums to General Accident, the bankruptcy court is AFFIRMED. The ruling that the $15,000 payment was trust property is REVERSED. The bankruptcy court's determination that the Haimes payment represented earmarked funds is AFFIRMED with respect to the $17,767.69 allocated to the unpaid premiums, and REVERSED with respect to the $7,422.30 paid for the balance of Agency's business.

This case is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings in accordance with this ruling.

It is so ORDERED.

gous to paid-in capital than it is to earmarked